**STATE of Maine**

v.

**Edward BROWN.**

Supreme Judicial Court of Maine.

Argued Jan. 18, 1990.

Decided March 14, 1990.

James E. Tierney, Atty. Gen., Charles K. Leadbetter (orally), Garry L. Greene, Asst. Atty. Gen., Augusta, for the State.

Daniel W. Bates (orally), Herbert H. Bennett and Associates, P.A., Portland, for defendant.

Jeffrey Jones, Bean, Jones & Warren, Scarborough, Robert Dowlut, Washington, D.C., for amici curiae, Nat. Rifle Ass'n of America & Sportsman's Alliance of Me.

Joel C. Martin, Gerald F. Petruccelli, Petruccelli, Cox & Martin, Portland, for amici curiae, Center to Prevent Handgun Violence Legal Action Project, Michael J. Chitwood, Chief of Police of City of Portland, and Me. Chiefs of Police Ass'n.

Before McKUSICK, C.J., and ROBERTS, WATHEN, GLASSMAN, CLIFFORD, HORNBY and COLLINS, JJ.

McKUSICK, Chief Justice.

In 1987 the people of this state voted to amend article I, section 16, of the Maine Constitution to provide that "[e]very citizen has a right to keep and bear arms; and this right shall never be questioned." By their vote the people struck four words, "for the common defense," from the original provision, with the apparent intent of establishing for every citizen the individual right to bear arms, as opposed to the collective right to bear arms for the common defense.[1] The issue on this appeal is the constitutionality, after the 1987 amendment, of the criminal statute prohibiting the possession of a firearm by a convicted felon. That issue raises two questions: 1) Did the amendment create an absolute right to keep and bear arms, and 2) if it did not, does the possession-by-a-felon statute exceed the permissible bounds of reasonable regulation under the State's constitutional police power. We answer both questions in the negative.

The State appeals from an order entered by the Superior Court (Cumberland County, *Perkins, J.*) dismissing Count II of a two-count 1988 indictment charging defendant Edward Brown with possession of a firearm by a felon, 15 M.R.S.A. § 393(1)

---

1. From 1819 until its amendment in 1987, Me. Const. art. I, § 16, provided that: "Every citizen has a right to keep and bear arms for the common defense; and this right shall never be questioned."

(Class C) (1980).[2] Defendant pleaded not guilty to the possession-by-a-felon charge and moved for its dismissal. On his motion defendant argued that 15 M.R.S.A. § 393(1) is unconstitutional as applied to him because under section 16, as amended, his right to keep and bear arms is absolute and cannot be abridged by reason of his having been previously convicted of what he calls a "nonviolent" felony, operating a motor vehicle at a time when he as an habitual motor vehicle offender had had his license revoked.[3] Although the court ruled that the citizen's right under amended section 16 is not absolute but rather is subject to reasonable police power regulation, it concluded that there is no rational relationship between the possession of a firearm by a person previously convicted of a "nonviolent" felony and a threat to public safety. It therefore held section 393(1) unconstitutional as applied to defendant and dismissed Count II. Only that dismissal is now before us.[4]

For the State to prevail on its appeal from that dismissal, it must persuade us both that, contrary to defendant's contention, the citizen's right to keep and bear arms under amended section 16 is not absolute and that the possession-by-a-felon statute represents a reasonable exercise of the State's constitutional police power. The State does persuade us on both scores, and therefore we vacate the Superior Court's dismissal of the possession-by-a-felon charge against defendant.

■ Prior to the 1987 amendment the Maine Constitution afforded no absolute right to keep and bear arms and we now hold that no absolute right was created by the amendment. Both prior to and after its amendment, section 16 provided that the right to keep and bear arms "shall never be questioned"; the amendment to section 16 merely deleted the words "for the common defense." Before those four words were deleted, the section 16 right was not absolute, as declared by our prior case law, and the evident purpose of the amendment was merely to transform a collective right to bear arms into an individual right and nothing more.

The procedure for amending the Maine Constitution is prescribed in article X, section 4, with additional implementing provisions provided by statute, 1 M.R.S.A. §§ 351–353 (1989). Pursuant to section 353 the Attorney General, prior to submission of the question to the voters, "shall prepare a brief explanatory statement which shall fairly describe the intent and content of each constitutional resolution or statewide referendum that may be presented to the people." The Attorney General's statement must explain what a yes vote favors and what a no vote opposes. *Id.* Further, the Attorney General must have his explanation published twice in each daily newspaper in the state, the first time between 45 and 30 days prior to the vote, the second between 10 and 7 days prior to the same. *Id.*

In 1987 the Attorney General did prepare and publish the required explanation of the proposed amendment to section 16. The explanation provided:

> The proposal would amend the Maine Constitution to establish a new personal right to keep and carry weapons, in place of the existing right to bear arms for the

---

**2.** 15 M.R.S.A. § 393(1) provides in pertinent part:

> No person who has been convicted of any crime, under the laws of the United States, the State of Maine or any other state, which is punishable by one year or more imprisonment or any other crime which was committed with the use of a dangerous weapon or of a firearm against a person ... shall own, have in his possession or under his control any firearm, unless such a person has obtained a permit under this section.

**3.** Operating after revocation of the license of an habitual motor vehicle offender is classified as a

Class C offense, punishable by imprisonment for up to 5 years, 29 M.R.S.A. § 2298(2) (Supp. 1989), and carries a mandatory minimum sentence of 60 days imprisonment if, as in Brown's case, at least one of the convictions defining the person as an habitual offender is operating under the influence, *id.* § 2292(1)(B).

**4.** Count I of the 1988 indictment charges defendant with criminal threatening with a firearm. The Superior Court denied defendant's motion to dismiss that count also, but defendant has not sought review of that ruling.

common defense. In proposing the amendment, several legislators formally expressed their understanding and intention that *the proposed personal right, like the existing collective right, would be subject to reasonable limitation by legislation enacted at the state or local level.* The Attorney General has issued an opinion to the same effect.

The amendment would repeal the collective right of Maine citizens to keep and carry weapons as may be necessary to participate in the defense of the State or community through a broadly based, organized militia. The existing provision, as interpreted by the Maine Supreme Judicial Court in *State v. Friel,* 508 A.2d 123 (Me.1986), establishes no constitutional right to bear arms except this collective right of defense.

If approved, the amendment would take effect on the date of the Governor's proclamation of the vote.

*A "YES" vote favors establishing a personal constitutional right to keep and carry weapons, subject to reasonable regulation.*

A "NO" vote opposes establishment of such a constitutional right.

(Emphasis added) By the legislative resolution proposing the amendment of section 16, the question appearing on the ballot in November 1987 read, "Shall the Constitution of Maine be amended to clarify the rights of citizens to keep and bear arms?" Resolves 1987, ch. 2. That question standing by itself was at best uninformative [5] and required the voter to look elsewhere to learn how the amendment would "clarify" the rights of citizens to keep and bear arms. That necessary information was provided by the statutorily required statement prepared by the Attorney General. After he had discharged his obligations of explanation and publication, "[t]he electorate ... must be held to have had full knowledge of the terms of the amendment. In voting 'yes' on a question so submitted an elector does not vote upon or adopt the question as part of the amendment, but thereby merely expresses his assent to the amendment as proposed." *Opinion of the Justices,* 125 Me. 529, 532, 133 A. 265, 266 (1926); *see also Fellows v. Eastman,* 126 Me. 147, 150, 136 A. 810, 811 (1927). In the absence of a challenge to the Attorney General's official explanation of the amendment, we assume that the voters intended to adopt the constitutional amendment on the terms in which it was presented to them, including the interpretation that the individual right created by the amendment, like its predecessor collective right, is not absolute but rather remains subject to reasonable regulation by the legislature.

Our holding that amended section 16 does not vest every citizen with an absolute right to possess firearms also finds support in a common sense view of the context in which the voters of Maine adopted the 1987 amendment. Plainly, the people of Maine who voted for the amendment never intended that an inmate at Maine State Prison or a patient at a mental hospital would have an absolute right to possess a firearm. Once it is apparent, as common sense requires it to be, that amended section 16 does not bar some reasonable regulation of the constitutional right to possess firearms, the only remaining question becomes what are the outer bounds of reasonableness for the regulation of that non-absolute right. All of the case authority from other states likewise rejects the notion that the constitutional right to keep and bear arms is absolute. *See, e.g., People v. Smelter,* 175 Mich.App. 153, 437 N.W.2d 341 (1989); *State v. Smoot,* 97 Or.App. 255, 775 P.2d 344 (1989); *Gardner v. Jenkins,* 116 Pa. Commw.Ct. 107, 541 A.2d 406, *alloc. denied,* 520 Pa. 620, 554 A.2d 511 (1988); *City of Princeton v. Buckner,* 377 S.E.2d 139 (W.Va.1988); *State v. Hamlin,* 497

---

5. No issue has been raised here by either a party or an amicus curiae whether the use of the word "clarify" in the ballot question was misleading in describing an amendment that proposed to "establish a new personal right to keep and carry weapons, in place of the existing right to bear arms for the common defense." Attorney General's Explanation of Proposed Amendment to Me. Const. art. I, § 16, quoted above in the text. *See Opinion of the Justices,* 283 A.2d 234, 236 (Me.1971) ("an amendment presented to the voters by means of a question which is clearly misleading is void and of no effect").

So.2d 1369 (La.1986); *State v. Sabala,* 44 Wash.App. 444, 723 P.2d 5 (1986); *State v. Mak,* 105 Wash.2d 692, 718 P.2d 407, *cert. denied,* 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599 (1986). *See also State v. Friel,* 508 A.2d 123, 126 nn. 4 & 5 (Me. 1986), *cert. denied,* 479 U.S. 843, 107 S.Ct. 156, 93 L.Ed.2d 96 (1986).

In his brief and at oral argument defendant's only contention has been that the words of section 16 are unambiguous and unqualified; that in construing this constitutional provision we need not, and indeed must not, look beyond the bare words. Long ago Justice Holmes urged us to reject such a myopic approach to constitutional construction when he wrote:

> [T]he provisions of the Constitution are not mathematical formulas having their essence in their form.... Their significance is vital not formal; it is to be gathered not simply by taking the words and a dictionary, but by considering their origin and their line of growth.

*Gompers v. United States,* 233 U.S. 604, 610, 34 S.Ct. 693, 695, 58 L.Ed. 1115 (1914). By way of comparison to our amended section 16, the words of the First Amendment are equally unambiguous and unqualified: "Congress shall make no law ... abridging the freedom of speech, or of the press...." Yet the United States Supreme Court has "reject[ed] the view that freedom of speech

and association ... are 'absolutes' ... in the sense that the scope of that protection must be gathered solely from a literal reading of the First Amendment." [6] *Konigsberg v. State Bar of California,* 366 U.S. 36, 49, 81 S.Ct. 997, 1006, 6 L.Ed.2d 105 (1961). The Court has upheld in a variety of contexts [7] "general regulatory statutes, not intended to control the content of speech but incidentally limiting its unfettered exercise...." *Id.* at 50, 81 S.Ct. at 1007. Those regulations "have been found justified by *subordinating valid governmental interests,* a pre-requisite to constitutionality which has necessarily involved a weighing of the governmental interest involved." *Id.* at 51, 81 S.Ct. at 1007 (emphasis added). In the same way, "by considering their origin and their line of growth," including in particular the way the 1987 amendment was submitted to the voters, we conclude that the words of amended section 16 do not declare absolute rights. Rather, the individual right to keep and bear arms there substituted for the previous collective right is subject to the same reasonable regulation as before in circumstances where regulation is justified by "subordinating valid governmental interests." Review of the constitutionality of that regulation still requires a weighing of the governmental interest involved, and we now turn to the second question before us:

6.  Interestingly enough for our present purposes, the Supreme Court in declaring the nonabsolute nature of the First Amendment, despite its unqualified commands, referred to the federal counterpart of our section 16:

> In this connection also compare the equally unqualified command of the Second Amendment: "the right of the people to keep and bear arms shall not be infringed." And see *United States v. Miller,* 307 U.S. 174 [178–82, 59 S.Ct. 816, 818–20, 83 L.Ed. 1206 (1939) (restriction of transportation of sawed-off shotguns in interstate commerce)].

*Konigsberg v. State Bar of California,* 366 U.S. 36, 49 n. 10, 81 S.Ct. 997–1006 n. 10, 6 L.Ed.2d 105 (1961).

7.  Despite the "preferred position" accorded First Amendment rights, *see Murdoch v. Pennsylvania,* 319 U.S. 105, 115, 63 S.Ct. 870, 876, 87 L.Ed. 1292 (1943), general regulation limiting the unfettered exercise of those rights has, for example, been upheld in the following contexts: the advocacy of or incitement to imminent lawless

action, *see Hess v. Indiana,* 414 U.S. 105, 94 S.Ct. 326, 38 L.Ed.2d 303 (1973); *Brandenburg v. Ohio,* 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969); libel of public and private figures, *see Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986); *Time, Inc. v. Hill,* 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967); "fighting words" in front of hostile audiences, *see Cohen v. California,* 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284, *reh'g. denied,* 404 U.S. 876, 92 S.Ct. 26, 30 L.Ed.2d 124 (1971); *Chaplinsky v. New Hampshire,* 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942); obscenity, *see Pope v. Illinois,* 481 U.S. 497, 107 S.Ct. 1918, 95 L.Ed.2d 439 (1987); *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419, *reh'g denied,* 414 U.S. 881, 94 S.Ct. 26, 38 L.Ed.2d 128 (1973); and time, place, and manner restrictions on otherwise unrestricted speech, *see Greer v. Spock,* 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976); *Adderley v. Florida,* 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966), *reh'g denied,* 385 U.S. 1020, 87 S.Ct. 698, 17 L.Ed.2d 559 (1967).

Although the new individual right to keep and bear arms is not absolute, is the prohibition of the possession of a firearm by a person convicted of a "nonviolent" felony nonetheless unconstitutional because it is in excess of the State's police power? Our answer is no.

■ In both its original and amended forms, section 16 appears in the same constitution as article IV, part 3, section 1, giving the legislature "full power to make and establish all reasonable laws and regulations for the ... benefit of the people of this State...."[8] It has long been settled law that the State possesses "police power" to pass general regulatory laws promoting the public health, welfare, safety, and morality. *See, e.g., Shapiro Bros. Shoe Co., Inc. v. Lewiston–Auburn S.P.A.,* 320 A.2d 247, 254 (Me.1974); *State v. Old Tavern Farm, Inc.,* 133 Me. 468, 470, 180 A. 473, 475 (1935); *State v. Mayo,* 106 Me. 62, 66, 75 A. 295, 297 (1909). The police powers clause itself requires that the legislature's regulation of constitutional rights be reasonable. As we noted in *National Hearing Aid Centers, Inc., v. Smith,* 376 A.2d 456 (Me.1977):

> "Too much significance cannot be given to the word 'reasonable' in considering the scope of the police power in a constitutional sense, for the test used to determine the constitutionality of the means employed by the legislature is to inquire whether the restrictions it imposes on rights secured to individuals by the Bill of Rights are unreasonable, and not whether it imposes restrictions on such rights"....

Reasonableness in the exercise of the State's police power requires that the purpose of the enactment be in the interest of the public welfare and that the methods utilized bear a rational relationship to the intended goals. ... The reasonableness of a legislative enactment, however, is presumed.

376 A.2d at 460 (citations omitted). We went on to rule:

In order to withstand the test of reasonableness the regulatory means must bear a rational relationship to the evil sought to be corrected. ... It is not necessary that the methods adopted by the legislature be the best or wisest choice. No matter how much the court might have preferred some other procedure, if the measure is reasonably appropriate to accomplish the intended purpose we must give it effect. ... Debatable questions regarding the appropriateness of enactments should be resolved in the legislature, not in the courts.

376 A.2d at 461 (citations omitted).

Courts throughout the country have repeatedly found a rational relationship between statutes forbidding possession of firearms by any and all convicted felons and the legitimate state purpose of protecting the public from misuse of firearms. *See, e.g., State v. Comeau,* 233 Neb. 907, 448 N.W.2d 595 (1989); *State v. Ricehill,* 415 N.W.2d 481 (N.D.1987); *State v. Amos,* 343 So.2d 166 (La.1977); *State v. Blue,* 190 Colo. 95, 544 P.2d 385 (1975). In *Lewis v. United States,* 445 U.S. 55, 100 S.Ct. 915, 63 L.Ed.2d 198 (1980), the Supreme Court upheld the rationality of a provision of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C.App. § 1202(a)(1), prohibiting the possession of firearms by a person convicted of any felony, including a "nonviolent" one. Petitioner Lewis, who had been convicted in Florida in 1961 of the felony of breaking and entering, challenged the provision on the basis that the underlying felony conviction might have been invalid. The Court found no conflict between due process and the provision that did not distinguish between violent and nonviolent felonies, finding specifically that "Congress sought to rule broadly—to keep guns out of the hands of those who have demonstrated that 'they may not be entrusted with a firearm without becoming a threat to society.'" *Id.* at 63, 100 S.Ct. at 920 (quoting *Scarborough v. United States,*

---

**8.** Me.Const. art. IV, pt. 3, § 1, provides in pertinent part: "The Legislature, with the exceptions hereinafter stated, shall have full power to make and establish all reasonable laws and regula- tions for the defense and benefit of the people of this State, not repugnant to this Constitution, nor to that of the United States."

431 U.S. 563, 572, 97 S.Ct. 1963, 1968, 52 L.Ed.2d 582 (1977)). After summarizing the legislative history of the possession provision, the Court declared:

> Congress could rationally conclude that any felony conviction, even an allegedly invalid one, is a sufficient basis on which to prohibit the possession of a firearm. ... This Court has recognized repeatedly that a legislature constitutionally may prohibit a convicted felon from engaging in activities far more fundamental than the possession of a firearm.

*Lewis,* 445 U.S. at 66, 100 S.Ct. at 921 (citations omitted).

Prior to *Lewis,* the First Circuit had held that an act of Congress barring felons from possessing firearms was rationally related to a legitimate government purpose and so passed constitutional muster. *United States v. Harris,* 537 F.2d 563 (1st Cir. 1976), rejected Harris's argument that because the felony of which he was convicted was larceny in excess of $100, a "nonviolent" felony, the federal statute prohibiting felons from possessing firearms as applied to him violated the equal protection clause of the Fifth Amendment for lack of a rational relationship to a legitimate state purpose. The First Circuit declared:

> [A] government is not "prevented by the equal protection clause from confining 'its restrictions to those classes of cases where the need is deemed to be clearest,' " and the inclusion of appellant's less extreme, but nonetheless serious offense, does not deprive the statutory classification of " 'some relevance to the purpose for which the classification is made' ".... "It is not 'without support in reason' ... to conclude that a thief whose crime was a federal felony is an undesirable person to possess firearms; proof of an inescapable relationship between past and future conduct is not requisite."

*Id.* at 565 (citations omitted).

Statutes such as section 393(1), prohibiting possession of firearms by a felon regardless of the nature of the underlying felony, have never been found constitutionally deficient. These statutes bear a ra-

tional relationship to the legitimate governmental purpose of protecting the public from the possession of firearms by those previously found to be in such serious violation of the law that imprisonment for more than a year has been found appropriate. The habitual motor vehicle offender who drives during his license revocation is a felon, having been recognized by the legislature of this State as having committed a Class C crime, a serious offense punishable by incarceration of up to five years. *See State v. O'Neill,* 473 A.2d 415, 419 (Me. 1984) ("Maine has a legitimate interest in the use of imprisonment sanctions to deter prospective motor vehicle operators from flouting the civil disability classification of an habitual offender ... to assure maximum safety for all other travelers on the public highways of the State ... regardless of the basis upon which the person was declared ineligible to operate a motor vehicle"). One who has committed any felony has displayed a degree of lawlessness that makes it entirely reasonable for the legislature, concerned for the safety of the public it represents, to want to keep firearms out of the hands of such a person. *See State v. Friel,* 508 A.2d at 126; *State v. Vainio,* 466 A.2d 471, 476 (Me.1983), *cert. denied,* 467 U.S. 1204, 104 S.Ct. 2385, 81 L.Ed.2d 344 (1984); *State v. Myrick,* 436 A.2d 379, 383 (Me.1981); *State v. Heald,* 382 A.2d 290, 295 (Me.1978).

Defendant has shown himself to be an individual unable to obey highway safety laws to such an egregious extent that he has served a statutorily prescribed minimum sentence of 60 days imprisonment for his continued flagrant lawlessness. Labeling his preexisting felony status the product of a "nonviolent" crime obscures its seriousness as well as the very real threat to public safety created by his continued misconduct, a threat that might well be aggravated by the availability of a firearm. Defendant has demonstrated a disregard for the law to such an extent that, as applied to him, a legislative determination that he is an undesirable person to possess a firearm is entirely reasonable and consonant with the legitimate exercise of police power for the public safety.

The entry is:

Dismissal of Count II of the indictment vacated; remanded for proceedings consistent with the opinion herein.

All concurring.