The **LEAGUE OF WOMEN VOTERS**,
et al., Plaintiffs,

v.

G. William **DIAMOND**, et al., Defendants.

Civ. No. 96–0052–B.

United States District Court,
D. Maine.

April 8, 1996.

Stephen E.F. Langsdorf, Preti, Flaherty, Beliveau & Pachios, August, Maine, David Soley, Bernstein, Shur, Sawyer & Nelson, Portland, Maine, for Plaintiffs.

Thomas D. Warren, Attorney Generals Office, Augusta, Maine, for Defendants.

John Hubbard Rich, III, Perkins Thompson, Hinckley & Keddy, Portland, Maine, for Governmental Reform.

1. As the sponsor of the challenged legislation, the Committee for Governmental Reform has intervened as a Defendant in this action. In addition,

Samuel W. Lanham, Jr., Cuddy & Lanham, Bangor, Maine, Stephen J. Safranek, Detroit, MI, for U.S. Term Limits, Inc.

## ORDER DENYING PRELIMINARY INJUNCTION

BRODY, District Judge

Plaintiffs, the League of Women Voters, the Maine Council of Senior Citizens, two state legislators ("Legislator Plaintiffs"), and four voters ("Voter Plaintiffs"), seek preliminary injunctive relief to prevent Defendants G. William Diamond, Secretary of State of Maine and Andrew Ketterer, Attorney General of Maine, from enforcing the provisions of the Term Limitation Act of 1993, 21-A M.R.S.A. §§ 551–554 ("the Act").[1] For the reasons that follow, the Court denies Plaintiffs' Motion for Preliminary Injunction.

### Background

In 1993, Maine voters overwhelmingly passed I.B. 1, an initiative bill to impose limits on the number of consecutive terms various state officials can serve, including state senators and representatives. Relevant to the challenge in this case, the Act limits state senators and state representatives to four consecutive terms. 21-A M.R.S.A. §§ 553(1)–(2). The Act became law in December 1993, and applies to nominations and ballots printed after January 1, 1996. 21-A M.R.S.A. § 554.

In addition to the League of Women Voters and the Maine Council of Senior Citizens, Plaintiffs in this case include both state representatives and registered voters. Plaintiff Herbert Adams has served in the Maine House of Representatives continuously since 1988, and Plaintiff Roger Pouliot has served in the Maine House continuously since 1982. The Legislator Plaintiffs have fulfilled all other eligibility requirements to appear on the ballot for the June 1996 primary election, but have been informed that pursuant to the Act, their names will not appear on the primary ballots.

the Court granted leave for U.S. Term Limits, Inc. to argue orally on Plaintiffs' Motion.

Plaintiffs seek preliminary injunctive relief against enforcement of the Act, and seek ballot access for the Legislator Plaintiffs. Specifically, Plaintiffs allege that the Act violates both their federal constitutional rights and the Maine Constitution. Plaintiffs also argue that the Act does not apply to terms served prior to its effective date.

*Preliminary Injunction*

■ Disposition of a Motion for Preliminary Injunction depends on consideration of the following four factors: (1) the likelihood of the movant's success on the merits; (2) the potential for irreparable harm to the movant; (3) a balancing of the relevant equities, meaning the hardship to the non-movant upon issuance of the injunction against the hardship to the movant upon denial of the injunction; and (4) the effect on the public interest of a grant or denial of the injunction. *Gately v. Commonwealth of Massachusetts*, 2 F.3d 1221, 1224 (1st Cir.1993), *cert. denied*, — U.S. —, 114 S.Ct. 1832, 128 L.Ed.2d 461 (1994); *Narragansett Indian Tribe v. Guilbert*, 934 F.2d 4, 5 (1st Cir.1991). The first prong, however, is the indispensable requisite of the preliminary injunction. *Gately*, 2 F.3d at 1225. Thus, the thrust of the decision to grant preliminary injunctive relief boils down to a determination of whether the harm caused to the plaintiff without the injunction in light of the plaintiff's likelihood of success on the merits, outweighs the harm the injunction will cause the defendant. *Id.* (quoting *United Steelworkers of America v. Textron, Inc.*, 836 F.2d 6, 7 (1st Cir.1987)).

### A. Likelihood of Success on the Merits

Plaintiffs claim that the Act violates both the United States and Maine Constitutions. With respect to the Federal Constitution, Plaintiffs claim that the Act unconstitutionally impinges on their First and Fourteenth Amendment rights of free speech and association. Under the Maine Constitution, Plaintiffs claim that by imposing additional qualifications on state office holders, the Act attempts to do by legislation what can lawfully be done only by constitutional amendment. Plaintiffs also argue that as written, the Act does not apply to terms served before its effective date. On all three issues the Court concludes that Plaintiffs fail to establish a likelihood of success on the merits.

### 1. Federal Constitutional Claims

The United States Supreme Court has not determined whether a limitation on the number of consecutive terms state legislators can serve violates either the legislators', voters' or political parties' rights of speech and association.[2] The Supreme Court has, however, provided a framework to guide the lower courts' constitutional evaluation of state election laws. *See Burdick v. Takushi*, 504 U.S. 428, 434, 112 S.Ct. 2059, 2063–64, 119 L.Ed.2d 245 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 789–90, 103 S.Ct. 1564, 1570–71, 75 L.Ed.2d 547 (1983). An examination of the Act in the context of that framework leads this Court to conclude that Plaintiffs fail to establish a likelihood of success on the merits sufficient to support a preliminary injunction.

In *Anderson v. Celebrezze* the Supreme Court faced a First and Fourteenth Amendment challenge to an Ohio filing deadline which had the effect of keeping independent candidates off the ballot. 460 U.S. 780, 792, 103 S.Ct. 1564, 1571–72, 75 L.Ed.2d 547 (1983). The Supreme Court acknowledged the tendency of all ballot access laws to limit the field of candidates available to voters, and stressed the need "to examine, in a realistic light the extent and nature of their impact on voters." *Id.* at 786, 103 S.Ct. at 1569. Accordingly, the Court set forth a test that requires courts to balance the magnitude of the asserted injury to a plaintiff's First and Fourteenth Amendment rights against the precise interests asserted by the

---

**2.** Notably, no lower court to have examined the constitutionality of term limits on state legislators has found them to violate First or Fourteenth Amendment rights. *See Bates v. Jones*, 904 F.Supp. 1080, 1096 (N.D.Cal.1995); *U.S. Term Limits v. Hill*, 316 Ark. 251, 872 S.W.2d 349, 359–60 (1994); *Legislature of the State of California v. Eu*, 54 Cal.3d 492, 286 Cal.Rptr. 283, 302–03, 816 P.2d 1309, 1328–29 (1991), *cert. denied*, 503 U.S. 919, 112 S.Ct. 1292, 1293, 117 L.Ed.2d 516 (1992).

state to justify the burden imposed by its rule. *Id.* at 789, 103 S.Ct. at 1570. With respect to the latter consideration, courts must determine both the legitimacy and strength of the state's asserted interests and the extent to which those interests make necessary the burden on the plaintiff's rights. *Id.*

In *Burdick v. Takushi,* the Supreme Court faced a voter challenge to a Hawaiian prohibition on write-in ballots. 504 U.S. at 430, 112 S.Ct. at 2061–62. The Court reiterated that the mere fact that a state's election system creates barriers tending to limit the field of candidates does not by itself compel strict scrutiny. *Id.* at 433, 112 S.Ct. at 2062–63 (quoting *Bullock v. Carter,* 405 U.S. 134, 143, 92 S.Ct. 849, 855–56, 31 L.Ed.2d 92 (1972)). The Court elaborated on the *Anderson* test, indicating that the rigor with which courts evaluate state election laws depends on the degree to which the challenged laws burden a plaintiff's rights. 504 U.S. at 434, 112 S.Ct. at 2063–64. When the election law subjects those rights to severe restrictions, the state must narrowly draw the law to advance a compelling interest. *Id.* When a state election law imposes only "reasonable, nondiscriminatory restrictions" on a plaintiff's First and Fourteenth Amendment rights, the state must assert only an important regulatory interest to justify its restriction. *Id.* (quoting *Anderson,* 460 U.S. at 788, 103 S.Ct. at 1569–70). In other words, *Burdick* essentially establishes that a severe restriction subjects the election law to strict scrutiny, while a reasonable, nondiscriminatory restriction subjects the law to the less rigorous *Anderson* analysis. *See id.*

■ The *Burdick* Court did not delineate where on the scale of restrictions an election law moves from reasonable to severe. A close reading of *Burdick,* however, in light of several of the Supreme Court's dispositions of state election law challenges, reveals two key indicators of when a restriction moves from legitimate to severe: whether the restriction is content based or content neutral, and the extent to which alternative routes to ballot access minimize the restriction on the plaintiff's rights. *See* 504 U.S. at 436–37, 438, 112 S.Ct. at 2064–65, 2066.

The content neutrality of the challenged election law provides one measure of the severity of the burden on a plaintiff's First and Fourteenth Amendment rights. *See Burdick,* 504 U.S. at 438, 112 S.Ct. at 2065–66. The Supreme Court has "repeatedly upheld reasonable, politically neutral regulations that have the effect of channeling expressive activity at the polls," because such regulations do not require voters to espouse positions they do not support. *Id.* Thus, in *Burdick,* for example, the Supreme Court concluded that "there is nothing content based about a flat ban on all forms of write-in ballots," and declined to subject the Hawaiian law to strict scrutiny. *Id.*

The existence of alternative mechanisms to ballot access may also measure the severity of the burden an election law imposes on a plaintiff's First and Fourteenth Amendment rights. *See Burdick,* 504 U.S. at 436–37, 112 S.Ct. at 2064–65. Although the Hawaiian write-in prohibition closed off one route to ballot access, the *Burdick* Court noted that the multitude of alternative mechanisms in the Hawaiian election system ensures easy access to the ballot. *Id.* at 436, 112 S.Ct. at 2064–65. Easy alternative access, in turn, minimized the burden the prohibition on write-in ballots imposed on the plaintiff's First and Fourteenth Amendment rights. *Id.* at 437, 112 S.Ct. at 2065.

*Burdick* fails to describe precisely when state election laws shift from reasonable restrictions to severe burdens on First and Fourteenth Amendment rights, and thus does not clearly indicate when courts must subject election laws to strict scrutiny. In addition, neither *Burdick, Anderson,* nor any other Supreme Court case directly examine the constitutionality of state term limits. *Burdick* does however, provide some hints as to how lower courts should determine whether to apply strict scrutiny or the lesser *Anderson* scrutiny, including whether the election law is content based or content neutral, and the extent to which the election law forecloses access to the ballot.

■ Plaintiffs in this case claim a severe burden and urge this Court to subject the Act to strict scrutiny. At the preliminary

injunction stage the Court is forecasting Plaintiffs' likelihood of success on the merits and not rendering a final decision. At this stage in the analysis, therefore, the Court concludes that while clearly not *de minimis*, Plaintiffs have not succeeded in establishing that the burden the Act imposes on their First and Fourteenth Amendment rights will rise to the level of strict scrutiny. *See Burdick*, 504 U.S. at 433–34, 112 S.Ct. at 2062–64 (not every restriction on fundamental voting rights triggers strict scrutiny).

The Act cannot be fairly characterized as content based. Unlike the election law challenged in *Anderson*, for example, the Act does not have the effect of excluding independent political candidates, and therefore, new ideas from the ballot. *See* 460 U.S. at 791–92, 103 S.Ct. at 1571–72. It does not distinguish between or select among the range of ideas and political discourse from which voters can choose. The Act simply amounts to a flat ban, applicable to every incumbent, on the number of consecutive terms served in the Maine legislature. *Cf. Burdick*, 504 U.S. at 438, 112 S.Ct. at 2065–66 (flat ban on write-in ballots is content neutral).

Plaintiffs cite several cases in which the Supreme Court has struck down state election laws. In each, however, the challenged election law had a content based effect. *See Norman v. Reed*, 502 U.S. 279, 293–94, 112 S.Ct. 698, 707–08, 116 L.Ed.2d 711 (1992) (election law placed different requirements on new parties seeking ballot access); *Anderson*, 460 U.S. at 792–93, 103 S.Ct. at 1571–72 (election law effectively precluded independent candidate from challenging established party candidates in presidential primary); *Illinois Elections Board v. Socialist Workers Party*, 440 U.S. 173, 185–87, 99 S.Ct. 983, 990–92, 59 L.Ed.2d 230 (1979) (election law created higher threshold for new parties or independent candidates to get ballot access); *McDaniel v. Paty*, 435 U.S. 618, 629, 98 S.Ct. 1322, 1329, 55 L.Ed.2d 593 (1978) (election law discriminated against candidates on the basis of religion); *Lubin v. Panish*, 415 U.S. 709, 716–18, 94 S.Ct. 1315, 1320–21, 39 L.Ed.2d 702 (1974) (election law

discriminated against candidates on the basis of wealth).

In *Anderson*, for example, Ohio's early filing deadline discriminated against candidates and voters outside the existing political parties. 460 U.S. at 795, 103 S.Ct. at 1573. In *Lubin*, California's filing fee discriminated against indigent candidates by excluding from the ballot anyone who could not afford the fee. 415 U.S. at 717–18, 94 S.Ct. at 1320–21. In *McDaniel*, the Tennessee provision discriminated against the free exercise of religion by forcing candidates to choose between clergy and elected office. 435 U.S. at 628–29, 98 S.Ct. at 1328–29. By contrast, the Act under scrutiny in this case makes no distinctions among candidates on the basis of wealth, party affiliation, race, or ideas. It is simply a content neutral ban on every candidate from exceeding a certain number of consecutive terms.

Plaintiffs also argue that the Act leaves candidates and voters without alternative mechanisms for ballot access. Plaintiffs contend that the Act effectively prohibits "termed out" incumbents from "continuing to serve," and their supporting voters from "casting their votes." (Pl's.Mot.Prelim.Inj. at 15.) The Court disagrees with Plaintiffs' draconian view of the Act. While the Act limits ballot access in a different manner than the Hawaiian write-in ballot prohibition in *Burdick*, it cannot fairly be characterized as effecting a complete foreclosure of ballot access to incumbents. First, the Act does not establish a lifetime ban on termed out incumbents. Instead it requires them to sit out for one term, after which they may seek their prior office. Second, the Act in no way prohibits or hinders any termed out incumbent from gaining ballot access for a different elected position. An election law that prevents voters from casting ballots for the specific candidate of their choice, without more, does not itself compel strict scrutiny. *See Burdick*, 504 U.S. at 433, 112 S.Ct. at 2063.

Only one federal court has concluded that term limits on state legislators may impose a severe burden on voters' First and Fourteenth Amendment rights. *See Bates v. Jones*, 904 F.Supp. 1080, 1096 (N.D.Cal.

1995). In *Bates v. Jones,* the Northern District of California examined Proposition 140, which imposes a lifetime term limitation on state legislators of two terms for state senators and three terms for state representatives. 904 F.Supp. at 1085. In evaluating whether the plaintiffs stated a claim, the court declined to determine that Proposition 140 passed constitutional muster as a matter of law, and concluded that the voter plaintiffs demonstrated a severe infringement of their First and Fourteenth Amendment rights. *Id.* at 1096.

In arriving at that conclusion, the court reviewed a decision of the California Supreme Court upholding Proposition 140 against virtually the same challenge. *Bates,* 904 F.Supp. at 1093–96. In particular, the *Bates* Court took issue with the California Supreme Court on whether candidates are fungible, opining that unique qualities of temperament, native skill and experience make each candidate an individual, and more than the political platform and ideas he or she espouses. *Id.* at 1094. The *Bates* Court also questioned the applicability of cases upholding gubernatorial term limits, avowing that the greater concentration of power in a chief executive makes the state's interest in preventing abuse of power more compelling, and that a gubernatorial term limit is not imposed on a given district's incumbent against that district's will. *Id.*

This Court, however, has concluded that Plaintiffs will not likely succeed in demonstrating a severe burden on their First and Fourteenth Amendment rights. The Supreme Court has clearly indicated that while every election law in some capacity limits the field of candidates from which voters can choose, that fact alone does not compel a strict scrutiny analysis of every such law. *Burdick,* 504 U.S. at 433, 112 S.Ct. at 2063. That all candidates are individuals apart from their platform and ideas, therefore, will not likely by itself establish a severe burden and compel strict scrutiny. *See id.*

Notable differences between the Act and California Proposition 140 underscore the Court's conclusion that the burden the Act imposes falls short of severe. California Proposition 140 imposes a life time prohibi-

tion on terms of service, and by extension, a permanent limitation on the field of candidates from which voters can choose. *See Legislature of the State of California v. Eu,* 54 Cal.3d 492, 286 Cal.Rptr. 283, 289, 816 P.2d 1309, 1315 (1991) (California Proposition 140 imposes life time limitation). The Act, however, merely limits the consecutive number of terms a candidate may serve, and requires only a one term waiting period before termed out incumbents may again run for their prior office. Even to the extent, therefore, that the individuality of candidates bears on the burden term limits impose on First and Fourteenth Amendment rights, the Act by its own terms is far less reaching than California Proposition 140. *See Bates,* 904 F.Supp. at 1094 (concern about fungibility of candidates factors into conclusion that burden of Proposition 140 is severe).

Despite its suggestion that Proposition 140 imposes a severe burden on First and Fourteenth Amendment rights, the *Bates* Court denied preliminary injunctive relief, in large part because plaintiffs in that case failed to demonstrate a likelihood of success on the merits. 904 F.Supp. at 1097. The Court recognized that "there is no authority finding any state term limits unconstitutional." *Id.* at 1096. "Therefore," the *Bates* Court concluded, "this Court cannot find that Plaintiffs have established probable success on the merits, but only that they have raised serious questions." 904 F.Supp. at 1097.

In sum, all state election laws in some capacity burden candidates' and voters' First and Fourteenth Amendment rights. *Burdick,* 504 U.S. at 433, 112 S.Ct. at 2063; *Anderson,* 460 U.S. at 788, 103 S.Ct. at 1569–70. The state, however, has important regulatory interests against which the First and Fourteenth Amendment rights must be balanced. *Anderson,* 460 U.S. at 788–89, 103 S.Ct. at 1569–70. Accordingly, courts must subject election laws to strict scrutiny only when they impose a severe burden on a plaintiff's First and Fourteenth Amendment rights. *Burdick,* 504 U.S. at 434, 112 S.Ct. at 2063. Having determined that the Act is neither content based nor overly ballot preclusive, the Court, at this stage in the proceedings, concludes that Plaintiffs have not

demonstrated a likelihood of success on the merits that the Act imposes a severe burden on their First and Fourteenth Amendment rights.

■ Plaintiffs' failure to establish a likelihood of a severe burden relieves Defendants from the obligation to justify the Act with a compelling state interest. *Burdick,* 504 U.S. at 439, 112 S.Ct. at 2066. Instead, Defendants must suggest only an important regulatory interest to justify the restriction. *Id.* Defendants identify six interests served by term limitations, namely (1) reducing unfair advantages enjoyed by incumbents at the polls; (2) promoting fairer and more competitive elections; (3) encouraging qualified new candidates to run for public office; (4) dislodging entrenched political leadership; (5) curbing the power of political machines; and (6) encouraging the election of citizen representatives instead of career politicians intent on their own reelection. Again, at this juncture the Court is merely attempting to forecast Plaintiffs' likelihood of success on the merits, and is not rendering a final decision. Given that, the Court is satisfied that at least some of the interests Defendant offers are legitimate and strong. *See Anderson,* 460 U.S. at 789, 103 S.Ct. at 1570 (court must evaluate strength and legitimacy of state's interests).

The *Burdick* Court points out that " 'as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes.' " 504 U.S. at 433, 112 S.Ct. at 2063 (quoting *Storer v. Brown,* 415 U.S. 724, 730, 94 S.Ct. 1274, 1279, 39 L.Ed.2d 714 (1974)). While Defendants do not purport to fight chaos with the Act, they do seek to promote fairer and more competitive elections. Defendants point to high reelection rates to underscore their assertion that incumbents, both due to name recognition and the ability to use their office to promote their candidacy, enjoy an electoral advantage over challengers. Defendants also point to a number of state judicial decisions arriving at the same conclusion. *See U.S. Term Limits, Inc. v. Hill,* 316 Ark. 251, 872 S.W.2d 349, 359–60 (1994); *Legislature of the State of*

*California v. Eu,* 54 Cal.3d 492, 286 Cal.Rptr. 283, 299–300, 816 P.2d 1309, 1325–26 (1991), *cert. denied,* 503 U.S. 919, 112 S.Ct. 1292, 1293, 117 L.Ed.2d 516 (1992); *State ex rel. Maloney v. McCartney,* 159 W.Va. 513, 517–19, 223 S.E.2d 607, 611–13 (evaluating gubernatorial term limits), *appeal dismissed,* 425 U.S. 946, 96 S.Ct. 1689, 48 L.Ed.2d 190 (1976).

Without determining this issue finally on its merits, the Court concludes that Defendants have satisfied their burden to offer legitimate and important regulatory interests that out weigh the asserted injury to Plaintiffs' First and Fourteenth Amendment rights. *See Anderson,* 460 U.S. at 789, 103 S.Ct. at 1570. At this stage, the Court determines that the Act will likely survive *Anderson* scrutiny, and, therefore, that Plaintiffs have failed to demonstrate success on the merits of their federal constitutional claims.

### 2. Maine Constitution Claims

Plaintiffs also allege that the Act violates the Maine Constitution by impermissibly adding qualifications for office to those presently established in the Maine Constitution. Plaintiffs contend that a constitutional amendment provides the sole vehicle through which citizens may add qualifications to candidacy for state office. As with Plaintiffs' federal constitutional claims, the Court concludes that Plaintiffs fail to establish a likelihood of success on the merits of their state constitutional claims.

Prior to submission of the Act to the voters, the Justices of the Supreme Judicial Court of Maine, in response to the Maine House of Representatives, issued an advisory opinion on the constitutionality of the Act under the Maine Constitution. *See Opinion of the Justices,* 623 A.2d 1258 (Me.1993). With respect to legislated term limits on state legislators, the Justices reasoned that the qualifications enumerated in the Maine Constitution do not "clearly and unmistakably give rise to an implication that the legislature is without authority to prescribe additional qualifications for representatives or senators, provided the added qualifications are reasonable, do not conflict with the Con-

stitution, and violate no guaranteed rights." *Id.* at 1263. The Justices further noted that "[p]rescribing additional qualifications by statute does not implicate the constitutionally guaranteed right of suffrage, but reasonable restrictions on the eligibility for holding office only incidentally involve that right." *Id.* The Justices concluded that the limitations imposed by the Act fell within the legislative power, and if enacted, would be constitutionally valid. *Id.*

Subsequent to the *Opinion of the Justices,* the United States Supreme Court issued its opinion in *U.S. Term Limits v. Thornton,* in which it struck down the portion of an Arkansas law imposing term limits on members of the United States House of Representatives and Senate. — U.S. —, —, 115 S.Ct. 1842, 1871, 131 L.Ed.2d 881 (1995). After an exhaustive analysis, the. Supreme Court determined that the Framers of the Constitution included the Qualifications Clause specifically to establish nationally uniform qualifications for congressional candidates. *Id.* The Supreme Court concluded, therefore, that only a constitutional amendment may add to or detract from the Qualifications Clause. *Id.* In making that determination, however, the Supreme Court specifically stated that its decision did not extend to state law issues. *Id.* at — n. 1, 115 S.Ct. at 1846 n. 1.

Plaintiffs point out that the qualifications language in the Maine Constitution nearly identically resembles the Qualifications Clause in the Federal Constitution, and that the Justices issued their advisory opinion without the benefit of the thorough historical and precedental analysis of that clause which *Thornton* provides. Plaintiffs essentially contend that faced with a qualifications based challenge to the Act today, *Thornton* might persuade the Justices to interpret the Maine Constitution qualifications language differently. The Court disagrees.

■ An advisory opinion is not binding precedent on courts construing Maine law.

*Bell v. Town of Wells,* 510 A.2d 509, 516 n. 14 (Me.1986). In the absence of any direct authority from the Supreme Judicial Court of Maine on the issue, however, the Court concludes that the advisory opinion of the Justices provides the best forecast of how the Supreme Judicial Court of Maine would evaluate state constitutional issue Plaintiffs raise. The advisory opinion, therefore, provides the best forecast of Plaintiffs' likelihood of success on the merits of this claim.

■ The advisory opinion clearly reflects the opinion of a majority of the Justices of Maine's highest tribunal that the legislature may adopt additional, reasonable qualifications for state legislators under the Maine Constitution, and that the additional qualifications the Act imposes are reasonable.[3] *Opinion of the Justices,* 623 A.2d at 1263. Contrary to Plaintiffs' arguments, the advisory opinion establishes that either the legislature or a constitutional amendment may impose additional, reasonable qualifications for state senators and representatives. *Id.* While the *Thornton* decision may indeed have influenced the Justices' construction of the Maine qualifications language had it been available when they considered the Act, that speculation does not outweigh the concrete language of the advisory opinion as a forecast of Plaintiffs' likelihood of success on the merits of their state constitutional claims. In short, the *Thornton* analysis and decision is not as persuasive to this Court on Maine constitutional interpretation as an advisory opinion of the majority of the Justices of the Supreme Judicial Court of Maine that deals directly with the state constitutional question Plaintiffs raise.

The Court concludes that Plaintiffs fail to establish a likelihood of success on the merits of their state constitutional claims.

### 3. Retroactivity

■ Title 21–A M.R.S.A. § 553 provides for limitations on the consecutive number of terms state senators, representatives, the

---

**3.** Justices Wathen, Roberts, Collins, Rudman and Dana concurred in the advisory opinion. *Opinion of the Justices,* 623 A.2d at 1263. Two Justices, Justices Glassman and Clifford, expressed no opinion on the substantive constitutional issues raised. Instead, they felt that a constitutional evaluation of the Act before it had been adopted would be premature. *Id.* at 1265. Accordingly, they declined to reach the constitutional issues surrounding the Act. *Id.*

secretary of state, state treasurer, attorney general and state auditor may serve. The last line of § 553 reads "[t]his section applies to terms of office that begin on or after December 3, 1996." Based on that language Plaintiffs contend that incumbents do not begin accruing terms toward the limitations in the Act until 1996. While § 553 can be read as Plaintiffs suggest, Defendants argue persuasively that the last sentence of § 553 simply indicates that the disqualification § 553 imposes begins on or after December 3, 1996.

The initiated bill, which the voters adopted and which became the Act, clears up any ambiguity in § 553 in favor of Defendants' interpretation. Section 2 of the initiated bill, entitled "Transition," provides that "[a] person elected or appointed to an office subject to the provisions of this Act who is disqualified from service by this Act may complete that person's term of office if the term commences on or before December 2, 1996." 21–A M.R.S.A. § 553 (Historical and Statutory Notes). In other words, the initiated bill contemplated that anyone subject to § 553 who began a term before December 3, 1996, could complete that term. A plain reading of § 553 disqualifies any official subject to the Act who has served the maximum number of terms by December 3, 1996.

■ As Defendants point out, relevant legislative history buttresses this reading of § 553. Title 1 M.R.S.A. § 353 requires the Attorney General to prepare a brief explanatory statement which fairly describes the intent and content of each statewide referendum or proposed constitutional amendment. That statement must include an explanation of what a "yes" vote favors, and what a "no" vote opposes. *Id.* The Attorney General must publish the statement in each daily newspaper in the state. *Id.* The Supreme Judicial Court of Maine places significant interpretive weight on the required statements. *See State v. Brown,* 571 A.2d 816, 818 (Me.1990). Indeed, the Law Court has indicated that "[i]n the absence of a challenge to the Attorney General's official explanation of the amendment, we assume the voters intended to adopt the constitutional amend-

ment on the terms in which it was presented to them...." *Id.*

The Attorney General's statement explaining the Act states that "[t]hese limitations would apply to the general election of 1996; meaning that any person who has served the requisite number of terms by that time would be disqualified from seeking reelection or reappointment in that year." Neither party challenges the official explanation, and the Court assumes that the voters intended to adopt the Act on the basis of that explanation. *See Brown,* 571 A.2d at 818. That explanation further clarifies any ambiguity in § 553 in favor of Defendants' interpretation.

In sum, both section 2 of the initiated bill and the Attorney General's statement of explanation of the Act compel the conclusion that consecutive terms served prior to December 3, 1996 factor into the disqualification based on consecutive terms imposed by § 553. That conclusion, in turn, compels the Court to conclude that Plaintiffs have failed to demonstrate a likelihood of success on the merits of their retroactivity claim.

*B. Additional Factors Relevant to Preliminary Injunction*

■ As indicated, in disposing of Motions for Preliminary Injunction courts must consider the plaintiff's likelihood of success on the merits, as well as the potential for irreparable harm to the movant, a balancing of the relevant equities, meaning the hardship to the non-movant upon issuance of the injunction against the hardship to the movant upon denial of the injunction, and the effect on the public interest of a grant or denial of the injunction. *Gately,* 2 F.3d at 1224.

The Court has concluded that Plaintiffs fail to establish a likelihood of success on the merits of all of their claims. Since Plaintiffs have not established likelihood of success that the Act imposes an overly severe burden on their First and Fourteenth Amendment rights, Plaintiffs have also failed to demonstrate irreparable harm.

By contrast, a preliminary injunction, on the basis of something less than a likelihood of success on the merits, could impose tremendous harm on Defendants, as well as the

public interest. *See Bates,* 904 F.Supp. at 1097. The Court "cannot ignore the consequences of thrusting into the election a candidate whose qualification to serve may ultimately prove invalid." *Id.* Nor can the Court ignore the "chaos and voter disappointment which could result from an improvidently granted order...." *Id.* Finally, the Court also notes that Plaintiffs helped create the situation necessitating preliminary injunctive relief by their delay in bringing the action. Despite specific questioning by the Court at oral argument, Plaintiffs failed to offer any reason for their delay in filing this action. That delay, however, has contributed in significant part to Plaintiffs' request for a somewhat urgent preliminary injunction. *See, e.g., Bates,* 904 F.Supp. at 1097.

The Court concludes that a balancing of the relevant equities tips in Defendants' favor, and against the issuance of a preliminary injunction. Plaintiffs have failed to establish the likelihood of success on the merits and irreparable harm. Defendants have demonstrated significant potential harm both to them and the public interest of a preliminary injunction granted on less than a showing of a likelihood of success on the merits.

### Disposition

The Court *DENIES* Plaintiffs' Motion for Preliminary Injunction.

*SO ORDERED.*