Tom BATES; Edward H. Lyman; Richard Sterling; Ardis Graham; Richard D. Lewis; Lawrence J. Buchalter; Jonathan Browning; Rachel Sherman; Martha M. Escutia; Sylvia Hernandez; Ana Rosa Pena; Claudia Navar; Barbara J. Friedman; Susan Zarakov; and Harriet Sculley, Plaintiffs,

v.

Bill JONES, Secretary of State of the State of California; Bradley J. Clark, Alameda County Registrar of Voters; and Conny McCormack, Los Angeles County Registrar of Voters, Defendants.

Peter F. Schabarum and Lewis K. Uhler, Intervenors.

No. C 95–02638 CW.

United States District Court, N.D. California.

April 23, 1997.

Joseph Remcho, Remcho Johansen & Purcell, San Francisco, CA, for Tom Bates, Edward H. Lyman, Richard D. Lewis, Lawrence J. Buchalter, Jonathan Browning, Rachel Sherman.

Sharon L. Browne, Deborah J. La Fetra, Victor J. Wolski, Pacific Legal Foundation, Sacramento, CA, for Peter F. Schabarum, Lewis K. Uhler, Lee A. Phelps, National Tax Limitation Committee, Alliance of California Taxpayers & Involved Voters.

Karen Leaf, CA State Attorney General, Sacramento, CA, for Bill Jones.

Kelvin H. Booty, Jr., County of Alameda Counsel's Office, Oakland, CA, for Bradley J. Clark.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

WILKEN, District Judge.

### INTRODUCTION

Do the lifetime legislative term limits provisions of the California Constitution, as enacted by Proposition 140 in 1990, violate the United States Constitution? This question implicates some of the core values of our American system of government: majority rule, minority protections, the right to vote, the autonomy of the States, and the role of the federal courts in upholding constitutional principles.

Majority rule is the basic assumption of American government. The legitimacy of the democratic process, however, depends upon the ability of voters to express their political preferences at the ballot box. "The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." *Reynolds v. Sims,* 377 U.S. 533, 555, 84 S.Ct. 1362, 1378, 12 L.Ed.2d 506 (1964). The Constitution provides a number of safeguards to protect the right of the people to vote for their representatives. Some of these safeguards are explicit, such as the right to vote regardless of race or gender. The United States Supreme Court has found others to be implicit, such as the principle of one person, one vote. The Supreme Court has observed that congressional term limits "violate that 'fundamental principle of our representative democracy ... that the people should choose whom they please to govern them.'" *U.S. Term Limits, Inc. v. Thornton,* 514 U.S. 779, 793, 817–18, 115 S.Ct. 1842, 1850, 1862, 131 L.Ed.2d 881 (1995) (quoting *Powell v. McCormack,* 395 U.S. 486, 547, 89 S.Ct. 1944, 1977, 23 L.Ed.2d 491 (1969)).

The United States Supreme Court has held that a State may impose reasonable, nondiscriminatory restrictions on the ability of citizens to vote for the candidate of their choice when the State has an important reason for imposing those restrictions. When a State's restrictions on the ability of potential candidates to run for office impose a severe burden on voters' or candidates' First or Fourteenth Amendment rights, however, the State must establish that those restrictions are narrowly tailored to accomplish compelling State interests. Otherwise the restrictions are unconstitutional. *Burdick v. Takushi,* 504 U.S. 428, 434, 112 S.Ct. 2059, 2063–64, 119 L.Ed.2d 245 (1992). Permissible restrictions typically require candidates to demonstrate a modicum of popular support or to comply with reasonable procedures meant to insure orderly elections.

California's version of lifetime legislative term limits differs from the restrictions that the Supreme Court has upheld in the past in that it imposes an absolute and permanent

ban on the participation of a certain category of candidates: experienced legislators. This lifetime restriction on legislative service prevents voters who value legislative experience from expressing their preference when voting for their State legislators. It also permanently bars voters who support a particular term-limited candidate for the legislature from stating their support at the ballot box. Finally, it burdens voters' right to associate for the advancement of their political views by denying them the opportunity to rally around the candidates of their choice. California's version of term limits thus severely burdens the political process by denying voters the opportunity to vote for a category of candidates or for particular individuals whom they support.

California's sovereign interest in structuring its political institutions is due substantial deference. When a State restructures its political institutions in a manner that imposes a severe burden on the ability of citizens to vote for the representatives of their choice, however, the State must provide justifications in addition to its interest in determining its own political institutions. Otherwise State institutional decisions would be immune from federal constitutional scrutiny. The State also has a substantial interest in promoting political accountability. However, at the trial of this case, the State failed to establish, as it must, that a lifetime limit on legislative service is narrowly tailored to achieve this interest. Less restrictive versions of term limits would achieve the benefits attributed to lifetime term limits while imposing significantly less severe burdens on the rights of voters. Other reforms that do not restrict the ability of voters to vote for the candidates of their choice would also achieve the benefits attributed to lifetime term limits.

This Court does not lightly overrule the political judgment of the California electorate. However, it is the singular duty of a federal court to determine when political judgment must give way to constitutional principle. " 'One's right to life, liberty, and property ... and other fundamental rights may not be submitted to vote; they depend on the outcome of no elections.' A citizen's constitutional rights can hardly be infringed simply because a majority of the people choose that it be." *Lucas v. Forty–Fourth General Assembly,* 377 U.S. 713, 736–37, 84 S.Ct. 1459, 1474, 12 L.Ed.2d 632 (1964) (quoting *West Virginia State Bd. of Educ. v. Barnette,* 319 U.S. 624, 638, 63 S.Ct. 1178, 1185–86, 87 L.Ed. 1628 (1943)) (footnote omitted). When a law conflicts with the United States Constitution, it is the Constitution, not the expressed will of a majority of the voters, that must govern the Court's decision. "It is, emphatically, the province and duty of the judicial department, to say what the law is." *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 176, 2 L.Ed. 60 (1803).[1] Because California's extreme version of term limits imposes a severe burden on the right of its citizens to vote for candidates of their choice, and because it is not narrowly tailored to advance compelling State interests, it violates the First and Fourteenth Amendments of the United States Constitution.

## PROCEDURAL BACKGROUND

Former Assembly member Tom Bates and some of his supporters filed this lawsuit in 1995, seeking to enjoin enforcement of California's term limits so that Bates could run for reelection in 1996 to an eleventh term in the Assembly. The Court permitted the official proponents of Proposition 140, Peter Schabarum and Lewis Uhler, to intervene as Defendants. *Bates v. Jones,* 904 F.Supp. 1080, 1086 (N.D.Cal.1995).[2] The Court de-

---

**1.** The Ninth Circuit's recent observation that judges should not unnecessarily thwart the political will of the people does not negate the Court's duty to enforce the United States Constitution. *See Coalition for Economic Equity v. Wilson,* 110 F.3d 1431, 1437–38 (9th Cir. 1997). As the Ninth Circuit recognized, if an initiative violates the Constitution, the district judge must "remind[ ] the people that they must govern them-

selves in accordance with" constitutional principles. *Id.*

**2.** In granting Intervenors' motion to intervene, the Court relied upon *Yniguez v. Arizona,* 939 F.2d 727 (9th Cir.1991), which held that sponsors of ballot initiatives have standing to defend them against court challenges. Recently, the Supreme Court questioned the reasoning in *Yniguez. See Arizonans for Official English v. Ari-*

nied Plaintiffs' motion for a preliminary injunction, as well as Defendant Secretary of State Bill Jones' motion to dismiss for failure to state a claim. *Id.* at 1098.

In March, 1996, Defendants moved for summary judgment, and Plaintiffs moved for leave to amend their complaint by adding as new Plaintiffs Assembly members Martha Escutia and Barbara Friedman and some of their constituents. The Court denied Defendants' motion for summary judgment and granted Plaintiffs' motion for leave to amend. Order, May 30, 1996.

Trial was conducted from October 15 to October 24, 1996. Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the Court makes the following findings of fact and conclusions of law.

## FACTUAL BACKGROUND

### A. History of Term Limits

The movement to impose legislative term limits is a recent phenomenon, although one with some historical precedent in the eighteenth and nineteenth centuries.

The expectation that legislators would serve in office for a limited period of time, return to private life, and then perhaps serve again later, was widespread in colonial America. This practice was known as "rotation." Tr. 603 (Petracca).[3] Rotation was generally an informal social norm rather than a legal mandate, but the Frameworks of Pennsylvania and Delaware, drafted in the 1680s, explicitly required it. Tr. 604. However, no colony imposed a lifetime limit on legislative service. Tr. 609. After independence, the Articles of Confederation limited delegates to Congress to three years of service in any period of six years. *U.S. Term Limits,* 514

U.S. at 823–27, 115 S.Ct. at 1865–66; Articles of Confederation, art. V. The bills of rights of Massachusetts, Virginia, and a few other States enunciated the principle of rotation, but did not impose specific limits on legislative service. Tr. 604, 608. Of the States, only Pennsylvania formally required legislators to leave office after a specified period of time. No State imposed a lifetime limit on legislative service. Tr. 609.

Although the Constitutional Convention considered proposals to require members of Congress to rotate out of office, none was adopted. Tr. 89 (Fiorina); Tr. 397 (Jacobson);[4] *U.S. Term Limits,* 514 U.S. at 812, n. 22, 115 S.Ct. at 1859 & n. 22.

During most of the nineteenth century, rotation of office continued to be widely expected and practiced, but it was never formally imposed. Tr. 605 (Petracca). Especially after the presidency of Andrew Jackson, rotation came to be associated with the spoils system. It served as a device for insuring that the various elements of political coalitions all shared in the fruits of power. Tr. 90–91 (Fiorina). By the early twentieth century, however, rotation had become less prevalent. Tr. 607.

From the colonial era through the nineteenth century, the practice of rotation of office was distinct from the modern phenomenon of legislative term limits. Most importantly, rotation did not impose lifetime limits on the length of legislative service. Tr. 609 (Petracca); Tr. 91–92 (Fiorina). As the word "rotation" suggests, legislators were expected to serve for a period of time and then do something else, but former legislators were not barred from returning to the legislature after having taken some time off. Indeed, many nineteenth-century legislators were

---

*zona,* —— U.S. ——, ——–——, 117 S.Ct. 1055, 1067–68, 137 L.Ed.2d 170 (1997). It is thus doubtful that Intervenors have standing. Because the State clearly does have standing to defend provisions of its own constitution, *Arizonans for Official English* does not affect the current posture of this case.

**3.** Mark Petracca was the State's expert witness on term limits. An associate professor of political science at the University of California, Irvine, he has written extensively in favor of term limits

and is a member of the board of *Legal Limits,* a periodical which reviews legal cases involving term limits.

**4.** Morris Fiorina and Gary Jacobson were Plaintiffs' expert witnesses. Fiorina is a professor of Government at Harvard University. He has written extensively about representation and electoral accountability. Jacobson, a professor of political science at the University of California, San Diego, has written extensively on congressional elections.

professional politicians. It was simply understood that one politician would not hold onto a particular office for a prolonged period of time. Tr. 92 (Fiorina). Candidates were generally not forbidden from seeking additional terms, and voters were not prevented from supporting them.

### B. Professional Legislatures and Legislative Turnover

By the middle of the twentieth century, the ideal of a professional legislature capable of handling the complexities of modern, industrialized society and of countering executive authority largely supplanted the ideal of a citizen legislature made up of representatives who would return to private life after brief periods of legislative service. Tr. 68, 84 (Fiorina). After the Second World War, Congress and many State legislatures, including California's, became increasingly professionalized. Tr. 345 (Jacobson). Indeed, in 1966, Californians approved Proposition 1A, which institutionalized the ideal of a pro-

fessional legislature. Legislators' salaries rose, legislative staffing increased, and legislative supervision of the budgetary process became more sophisticated. Tr. 97 (Fiorina).

In the late 1980s and the 1990s, sentiment grew that legislators were becoming too secure and isolated and therefore less responsive to their constituents. As a remedy for this perceived problem, twenty-one States enacted some form of legislative term limits. Most States with term-limits provisions restrict the number of consecutive terms that legislators may serve or limit the number of years that an individual may serve as a legislator within a specified time frame. Six States other than California have imposed lifetime limits on legislative service.[5]

Most courts have rejected challenges to the constitutionality of term limits for State or local legislators.[6]

### C. Proposition 140 and *Legislature v. Eu*

In the late 1980s, the California legislature was perceived by some to be under the con-

---

**5.** The seven States with lifetime limits on legislative service are Arkansas, Ark. Const. Amend. 73, § 2 (three terms in lower house, two terms in upper house); California, Cal. Const. art. V, § 2 (three terms in lower house, two terms in upper house); Michigan, Mich. Const. art. IV, § 54 (three terms in lower house, two terms in upper house); Missouri, Mo. Const. art. III, § 8 (eight years in one house, sixteen years in both houses); Nevada, Nev. Const. art. IV, §§ 3–4 (twelve years in lower house, twelve years in upper house); Oklahoma, Okla. Const. art. V, § 17A (twelve years service in both houses); and Oregon, Ore. Const. art. II, § 19 (six years in lower house, eight years in upper house, or twelve years in both houses).

The fourteen States with some other form of term limits are Arizona, Ariz. Const. art. IV, pt. 2, § 21 (four consecutive terms); Colorado, Colo. Const. art. V, § 3 (four consecutive terms in lower house, two consecutive terms in upper house); Florida, Fla. Const. art. VI, § 4 (eight consecutive years); Idaho, Idaho Code § 34–907 (eight years of service within previous fifteen years); Louisiana, La. Const. art. III, § 4(E) (three consecutive terms); Maine, Me.Rev.Stat. Ann. tit. 21–A, § 553 (four consecutive terms); Massachusetts, Mass.Ann.Laws ch. 53, § 48 (four terms in preceding nine years); Montana, Mont. Const. art. IV, § 8 (eight years within preceding sixteen years); Nebraska, Neb. Const. art. III, § 8 (two consecutive terms); Ohio, Ohio Const. art. II, § 2 (four consecutive terms in lower house, two consecutive terms in upper house); South Dakota, S.D. Const. art. III, § 6

(four consecutive terms); Utah, Utah Code Ann. § 20A–10–201 (twelve consecutive years); Washington, Wash.Rev.Code § 44.04.015 (six of previous twelve years in lower house, eight of previous fourteen years in upper house); and Wyoming, Wyo.Stat. § 22–5–103 (twelve of previous twenty-four years).

**6.** *See Dutmer v. City of San Antonio,* 937 F.Supp. 587 (W.D.Tex.1996); *League of Women Voters v. Diamond,* 923 F.Supp. 266 (D.Me.) (denying preliminary injunction), *aff'd,* 82 F.3d 546 (1st Cir. 1996); *Miyazawa v. City of Cincinnati,* 825 F.Supp. 816, 817 (S.D.Ohio 1993), *aff'd on other grounds,* 45 F.3d 126 (6th Cir.1995); *U.S. Term Limits, Inc. v. Hill,* 316 Ark. 251, 872 S.W.2d 349 (1994), *aff'd on other grounds,* 514 U.S. 779, 115 S.Ct. 1842, 131 L.Ed.2d 881 (1995) (the constitutionality of State legislative term limits was not presented to the United States Supreme Court); *Legislature v. Eu,* 54 Cal.3d 492, 286 Cal.Rptr. 283, 816 P.2d 1309 (1991), *cert. denied,* 503 U.S. 919, 112 S.Ct. 1292, 1293, 117 L.Ed.2d 516 (1992); *Roth v. Cuevas,* 158 Misc.2d 238, 603 N.Y.S.2d 962 (Sup.Ct.), *aff'd,* 197 A.D.2d 369, 603 N.Y.S.2d 736, *aff'd,* 82 N.Y.2d 791, 604 N.Y.S.2d 551, 624 N.E.2d 689 (1993). *But see Thorsted v. Gregoire,* 841 F.Supp. 1068, 1081–82 (W.D.Wash.1994) (term limits on congressional service violate First and Fourteenth Amendments), *aff'd on other grounds,* 75 F.3d 454 (9th Cir.1996). For a discussion of the analysis of term limits in *Eu,* see the Court's previous published opinion on this case, *Bates,* 904 F.Supp. at 1093–95.

trol of a group of entrenched politicians more concerned with their own political survival than with the interests of their constituents or the well-being of the State. Proposition 140 was promoted as a means to break the grip of career politicians on the legislature and to promote greater public participation in the political process. The statement of purpose in Proposition 140 pronounced,

> The people find and declare that the Founding Fathers established a system of representative government based upon free, fair and competitive elections. The increased concentration of political power in the hands of incumbent representatives has made our electoral system less free, less competitive, and less representative. The ability of legislators to serve unlimited number of terms, to establish their own retirement system, and to pay for staff and support services at state expense contribute heavily to the extremely high number of incumbents who are reelected. These unfair incumbent advantages discourage qualified candidates from seeking public office and create a class of career politicians, instead of the citizen representatives envisioned by the Founding Fathers. These career politicians become representatives of the bureaucracy, rather than of the people whom they are elected to represent.

> To restore a free and democratic system of fair elections, and to encourage qualified candidates to seek public office, the people find and declare that the powers of incumbency must be limited. Retirement benefits must be restricted, state-financed incumbent staff and support services limited, and limitations placed upon the number of terms which may be served.

Cal. Const. art IV, § 1.5. Proposition 140 restricted retirement benefits for legislators, reduced the legislature's budget, and amended section 2(a) of article IV of the California Constitution to limit senators to two four-year terms and Assembly members to three two-year terms.[7] It also imposed term limits

on a variety of other State offices. The present lawsuit does not challenge term limits on non-legislative offices.

On November 6, 1990, California voters approved Proposition 140 by a margin of 52.17% to 47.83%. The degree of support for Proposition 140 varied widely throughout the State. For example, in Assembly District 12, Bates' district prior to the 1992 reapportionment, 62.9% of the voters opposed the measure. In Assembly District 46, the district to which Friedman was originally elected, 59.5% of the voters voted against Proposition 140. A majority of the voters in thirty of California's eighty assembly districts voted against the initiative. In other assembly districts, of course, significant majorities supported term limits. *See* Supplement to Statement of Vote November 1990, Tr.Ex. 44.

In 1991, the California legislature, a number of individual members of the legislature, and some of their constituents challenged the facial validity of Proposition 140 by filing a petition for a writ of mandate in the California Supreme Court. The California Supreme Court exercised its original jurisdiction over the petition because of the great public importance of the issues raised by the challenge. *Eu*, 54 Cal.3d at 500, 286 Cal.Rptr. 283, 816 P.2d 1309. The California Supreme Court evaluated the challenge to Proposition 140 on the basis of the briefs and other papers submitted by the parties and *amici curiae*. No trial was conducted, and no lower court examined the merits of the parties' legal or factual contentions.

The California Supreme Court upheld most of the provisions of Proposition 140, including legislative term limits. *Id.* at 501, 286 Cal.Rptr. 283, 816 P.2d 1309. It also rejected the position advanced by the State Attorney General on behalf of the Secretary of State of California that the term limits provisions of Proposition 140 simply limited the number of consecutive terms that legislators may serve. *Id.* at 503, 286 Cal.Rptr. 283, 816 P.2d 1309. It instead held that Proposition 140 imposed a lifetime limit on

---

**7.** Section 2(a) reads in its entirety:

The Senate has a membership of 40 Senators elected for 4–year terms, 20 to begin every 2 years. *No Senator may serve more than 2 terms.*

The Assembly has a membership of 80 members elected for 2–year terms. *No member of the Assembly may serve more than 3 terms.* (emphasized passages added by Proposition 140).

service in the legislature. *Id.* at 506, 286 Cal.Rptr. 283, 816 P.2d 1309.

The California Supreme Court's holding that Proposition 140's lifetime legislative term limits provisions do not violate the United States Constitution does not bind federal courts. *See Watson v. Estelle,* 886 F.2d 1093, 1095 (9th Cir.1989) (State supreme court decisions construing federal Constitution do not bind federal courts). However, its construction of the term limits provisions of Proposition 140 does. *See Arizonans for Official English,* —— U.S. at —— – ——, 117 S.Ct. at 1074–75 (State supreme courts provide definitive constructions of State laws). This Court, therefore, may not narrowly interpret the term limits provisions of Proposition 140 to avoid its constitutional difficulties.

### D. The Parties

Between 1977 and 1996, Plaintiff Tom Bates represented the area comprising the current 14th Assembly District. The precise borders of his district have changed with each reapportionment, but it has consistently included the city of Berkeley and adjoining neighborhoods. The district has reelected Plaintiff Bates by wide margins since the 1990 elections. In 1992, he received 85.41% of the vote in the Democratic primary and 82.14% in the general election. In 1994, he was unopposed in the primary and received 78.5% of the vote in the general election. Tr.Ex. 2. Pursuant to Article IV, section 2(a) of the California Constitution, Bates was not allowed to run in the November, 1996, election and may never again run for the California Assembly. Bates may run for other offices, including the State Senate, but he would prefer to serve in the Assembly because he is already familiar with his assembly district and with the workings of the Assembly itself. Tr. 171.

Bates testified that term limits are detrimental to the ability of legislators to represent their constituents effectively. According to Bates, it takes time for legislators to become familiar with their own districts and to develop areas of expertise. He believes that, as legislators gain expertise, their dependence upon lobbyists and executive branch agencies diminishes. Tr. 197–98.

Legislators also become more skilled in navigating the complexities of the legislative process. Coaxing bills through the legislature can take years of education and coalition building. Tr. 193, 211–12. Passage of legislation, however, is only the first step in implementing the priorities of constituents. A reluctant executive branch can thwart legislative enactments in a variety of ways, such as by providing inadequate funding. Tr. 172. According to Bates, experienced legislators are more attuned to the ways in which the executive can circumvent legislative intent and are therefore more capable of ensuring that legislative enactments are actually implemented. Finally, according to Bates, experienced legislators who are likely to remain in the legislature for a significant period of time carry greater clout in their dealings with administrative agencies because the administrators realize they will probably have to continue dealing with those legislators in the future. Tr. 182. Term limits, Bates concluded, weaken the legislature and impede the ability of the legislature to enact reforms.

Plaintiffs Jonathan Browning, Lawrence Buchalter, Ardis Graham, Richard Lewis, Edward Lyman, Rachel Sherman, and Richard Sterling, voters in the 14th Assembly District, would have voted for Bates in 1996 if he had been a candidate. The voter Plaintiffs believe that Plaintiff Bates was an exceptional representative, who served his constituents well and was unusually concerned with and effective at representing the needs of low-income and disabled citizens and protecting the environment. They do not believe that other candidates would represent them as effectively and as well as Bates. Some of the voter Plaintiffs testified that Bates' legislative experience was an important reason for their support and that they tend to prefer candidates with legislative experience over candidates without legislative experience. Tr. 159–60 (Buchalter); Tr. 132 (Lyman).

Plaintiff Martha Escutia was first elected to represent the 50th Assembly District in Los Angeles in 1992. She received 46.81% of the vote in the 1992 Democratic primary and 75.04% in the general election. In 1994, she

was unopposed in the primary and received 74.65% of the vote in the general election. She was unopposed again in the 1996 primary and was reelected to her third term in the general election. Tr. Ex. 25. In the absence of term limits, she probably would have run for either the Assembly or the Senate in 1998. Term limits prevent her from running for reelection to the Assembly, although not from running for election to the Senate.

At trial, she testified that during her first term she spent much of her time learning the legislative process. From her observation, legislators serving their final term became less effective because people dealing with them knew that they would soon be gone. She therefore fears that term limits will strengthen lobbyists and the executive branch at the expense of the legislature. Tr. 465–66. She also believes that term limits impede the formation of experienced minority leadership. Tr. 483.

Plaintiffs Sylvia Hernandez, Claudia Navar, and Ana Rosa Pena are voters in the 50th District who have voted for Escutia in the past, planned to vote for her in 1996, and would like to have the opportunity to vote to reelect her to the Assembly in 1998. Plaintiff Hernandez testified that she supports Escutia not only because of her stances on important political issues such as immigration, but also because of personal characteristics such as determination, commitment, and her approach to problem solving. Tr. 271. Hernandez believes that Escutia has become a more effective legislator over time. Tr. 274.

Plaintiff Barbara Friedman was elected to represent the 46th Assembly District in Los Angeles County at a special election on July 30, 1991. Since reapportionment, she has represented the 40th Assembly District, also in Los Angeles County. She received 15.99% of the vote in the 1991 special primary election and 72.54% in the special run-off election. She received 71.26% of the vote in the 1992 Democratic primary and 57.83% in the general election. In 1994, she was unopposed in the Democratic primary and garnered 57.92% of the vote in the general elec-

tion. Tr.Ex. 28. Term limits prevented her from running for reelection in 1996.

Friedman opposes term limits because they do not take into account the time it takes to master the legislative process, to become familiar with one's assembly district, and to train staff. Tr. 29–32. She believes that term limits will weaken the legislature's institutional memory and its ability to attract and retain skilled staff members. Tr. 33, 36.

Plaintiffs Harriet Brown Sculley and Susan Zarakov live in the 40th Assembly District, have voted for Friedman in the past, and would have liked to vote for her in 1996. Plaintiff Sculley testified that she supports Friedman not only because of her political positions, but also because she likes Friedman's style, responsiveness, and accessibility. Tr. 9–10. She believes that Friedman became a more effective representative in Sacramento the longer she served there. It was important for Sculley that Friedman represented her in the Assembly rather than at some other level of government because Assembly members can more easily represent community interests than, for example, State senators. Finally, Sculley testified that she prefers to vote for candidates with legislative experience rather than for inexperienced candidates. Tr. 15.

## ANALYSIS

### I. The Legal Standard

The parties agree that the test set forth in *Anderson v. Celebrezze,* 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983), and explained in *Burdick v. Takushi,* 504 U.S. 428, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992), is the proper standard to apply. The *Anderson–Burdick* test evolved as the Supreme Court has considered the significance to assign to the First and Fourteenth Amendment rights implicated in "ballot access" cases, that is, challenges to laws governing the procedures and eligibility requirements for political parties or candidates to appear on ballots. *See, e.g., Burdick,* 504 U.S. 428, 112 S.Ct. 2059 (upholding State's refusal to allow write-in votes); *Norman v. Reed,* 502 U.S. 279, 112 S.Ct. 698, 116 L.Ed.2d 711 (1992) (striking down requirement that small political parties

gather large number of signatures to appear on ballot for certain local elections); *Munro v. Socialist Workers Party,* 479 U.S. 189, 107 S.Ct. 533, 93 L.Ed.2d 499 (1986) (upholding requirement that third party candidates receive 1% of primary vote in order to appear on general election ballot); *Anderson,* 460 U.S. 780, 103 S.Ct. 1564 (striking down early filing deadline for third party candidates).

When determining the constitutionality of candidate eligibility requirements, a court

> must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests, it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional.

*Anderson,* 460 U.S. at 789, 103 S.Ct. at 1570. *Burdick* explained that,

> the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights. Thus, as we have recognized when those rights are subjected to 'severe' restrictions, the regulation must be 'narrowly drawn to advance a state interest of compelling importance.' But when a state election law provision imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions.

504 U.S. at 434, 112 S.Ct. at 2063 (quoting *Norman,* 502 U.S. at 289, 112 S.Ct. at 705, and *Anderson,* 460 U.S. at 788, 103 S.Ct. at 1569–70).

■ The test is thus hybrid. If the Court finds that California's version of legislative term limits imposes severe restrictions on Plaintiffs' First and Fourteenth Amendment

rights, it must apply strict scrutiny. If the Court finds that the restrictions are not severe, it must balance the rights asserted by Plaintiffs against the precise interests advanced by the State to justify the burdens imposed on Plaintiffs' rights. When evaluating the State's interests, the Court must consider the extent to which those interests require the State to burden Plaintiffs' rights. Important regulatory interests of the State, however, are generally sufficient to justify "reasonable, nondiscriminatory restrictions."

Interests that the Supreme Court has held are sufficient to justify reasonable, nondiscriminatory restrictions on ballot access are usually related to the State's interest in conducting organized and fair elections. Thus, the Supreme Court has upheld requirements that new political parties or independent candidates demonstrate a modicum of popular support before being listed on ballots. *Munro v. Socialist Workers Party,* 479 U.S. 189, 107 S.Ct. 533, 93 L.Ed.2d 499 (1986). Similarly, restrictions on the ability of losing primary candidates to run in general elections have been approved. *Storer v. Brown,* 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974). The Court has struck down requirements that it believes prevent the expression of dissenting or minority political viewpoints. *See, e.g., Norman,* 502 U.S. 279, 112 S.Ct. 698 (burdensome signature-gathering requirement for political parties); *Anderson,* 460 U.S. 780, 103 S.Ct. 1564 (early filing requirement for third-party or independent candidates); *Lubin v. Panish,* 415 U.S. 709, 94 S.Ct. 1315, 39 L.Ed.2d 702 (1974) (large candidate filing fees when imposed on low-income candidates).

■ As noted, the *Anderson–Burdick* test has evolved in ballot access cases. California's version of term limits, however, does not merely limit access to the ballot, it defines one of the qualifications for holding legislative office. *See U.S. Term Limits,* 514 U.S. at 834–35, 115 S.Ct. at 1870 (cases in which Supreme Court has upheld ballot access restrictions on congressional candidates have not imposed substantive qualifications rendering a class of potential candidates ineligible). By preventing a class of potential

candidates from running for legislative office and by denying voters the opportunity to vote for a class of potential candidates, term limits implicate First and Fourteenth Amendment rights at least as much as most ballot access provisions have. It would certainly be inappropriate to apply a more deferential test, such as rational basis review, to this case.

## II. Application of the *Anderson–Burdick* Test to Term Limits

### A. Individual Rights Implicated by Term Limits

■ The Supreme Court has repeatedly observed that laws defining the eligibility of candidates to appear on the ballot implicate the constitutional rights of both candidates and voters. In *Anderson*, for example, the Court observed,

> 'the rights of voters and the rights of candidates do not lend themselves to neat separation; laws that affect candidates always have at least some theoretical, correlative effect on voters.' Our primary concern is with the tendency of ballot access restrictions 'to limit the field of candidates from which voters might choose.' Therefore, '[i]n approaching candidate restrictions, it is essential to examine in a realistic light the extent and nature of their impact on voters.'

*Anderson*, 460 U.S. at 786, 103 S.Ct. at 1568 (quoting *Bullock v. Carter*, 405 U.S. 134, 143, 92 S.Ct. 849, 856, 31 L.Ed.2d 92 (1972)). *See also Burdick*, 504 U.S. at 438, 112 S.Ct. at 2065–66; *Lubin*, 415 U.S. at 716, 94 S.Ct. at 1320; *Williams v. Rhodes*, 393 U.S. 23, 30–31, 89 S.Ct. 5, 10–11, 21 L.Ed.2d 24 (1968); *Davies v. Grossmont Union High Sch. Dist.*, 930 F.2d 1390, 1397 (9th Cir.1991) ("the individual's right to seek public office is inextricably intertwined with the public's fundamental right to vote"), *cert. denied*, 501 U.S. 1252, 111 S.Ct. 2892, 115 L.Ed.2d 1057 (1991); *Erum v. Cayetano*, 881 F.2d 689, 691 (9th Cir.1989).

The cases on which the *Anderson* Court relied identified voting and associational rights as the rights most directly implicated by candidate eligibility requirements. 460

U.S. at 786–87 n. 7, 103 S.Ct. at 1569 n. 7 (citing *Williams v. Rhodes*, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968); *Bullock v. Carter*, 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972); *Lubin v. Panish*, 415 U.S. 709, 94 S.Ct. 1315, 39 L.Ed.2d 702 (1974); *Illinois Elections Bd. v. Socialist Workers Party*, 440 U.S. 173, 99 S.Ct. 983, 59 L.Ed.2d 230 (1979)). *See also Burdick*, 504 U.S. at 438, 112 S.Ct. at 2065–66 (ballot access restrictions affect voting rights); *Munro*, 479 U.S. at 193, 107 S.Ct. at 536 (restrictions on access of political parties to ballot impinge upon rights to associate and vote).

### 1. Voting Rights

" '[V]oting is of the most fundamental significance under our constitutional structure.' " *Burdick*, 504 U.S. at 433, 112 S.Ct. at 2063 (quoting *Illinois State Bd. of Elections*, 440 U.S. at 184, 99 S.Ct. at 990). Indeed, " 'no right is more precious in a free country than that of having a voice in the election of those who make the laws under which ... we must live.' " *Id.* at 441, 112 S.Ct. at 2067 (quoting *Wesberry v. Sanders*, 376 U.S. 1, 17, 84 S.Ct. 526, 535, 11 L.Ed.2d 481 (1964)). The Fourteenth Amendment " 'confers the substantive right to participate on an equal basis with other qualified voters whenever the State has adopted an electoral process for determining who will represent any segment of the State's population.' " *Lubin*, 415 U.S. at 713, 94 S.Ct. at 1318 (quoting *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 59 n. 2, 93 S.Ct. 1278, 1309 n. 2, 36 L.Ed.2d 16 (1973) (Stewart, J., concurring)). When announcing that seats in State legislatures must be apportioned on the basis of population, the Supreme Court declared, "The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." *Reynolds v. Sims*, 377 U.S. 533, 555, 84 S.Ct. 1362, 1378, 12 L.Ed.2d 506 (1964). The Court explained that,

> representative government is in essence self-government through the medium of elected representatives of the people, and each and every citizen has an inalienable right to full and effective participation in the political processes of his State's legisla-

tive bodies.... Full and effective participation by all citizens in state government requires, therefore, that each citizen have an equally effective voice in the election of members of his state legislature.

*Id.* at 565, 84 S.Ct. at 1383.

■ California's term limits provisions deny voters the opportunity to support experienced legislators. Term limits thus provide voters who prefer candidates who are not "career politicians" a structural advantage over those who support a particular experienced legislator or who prefer candidates with legislative experience in general. By denying some, but not all, voters the ability to vote for the candidates of their choice, term limits directly affect Plaintiffs' voting rights and their ability to participate on an equal basis in self-government.

■ Term limits thus burden Plaintiffs' Fourteenth Amendment right to participate on an equal basis with other voters in the election of their representatives. Term limits also burden Plaintiffs' First Amendment right of freedom of expression by imposing a content-based restriction on which candidates voters may vote for. The Supreme Court has held that States may impose reasonable, politically neutral restrictions on expressive activity at the polls. *Burdick,* 504 U.S. at 438, 112 S.Ct. at 2065–66. Term limits, however, are not politically neutral. They are a determination by the majority that one trait, legislative experience, is undesirable and that all voters should be prohibited from voting for candidates possessing that trait. A significant minority of voters are therefore absolutely precluded from expressing their political preference for experienced legislators when voting for their State representatives.

The Supreme Court has recently explained that congressional term limits are inconsistent with the ideal that the electorate should be able to choose its own representatives. In *U.S. Term Limits,* the Court observed that the imposition of term limits on Congress

"would violate that 'fundamental principle of our representative democracy ... that the people should choose whom they please to govern them.'" 514 U.S. at 793, 817–18, 115 S.Ct. at 1850, 1862 (quoting *Powell v. McCormack,* 395 U.S. 486, 547, 89 S.Ct. 1944, 1977–78, 23 L.Ed.2d 491 (1969)). The Court quoted Robert Livingstone, who declared during the Constitutional Convention that, "The people are the best judges who ought to represent them. To dictate and control them, to tell them whom they shall not elect, is to abridge their natural rights." *Id.* at 796–97, 115 S.Ct. at 1851 (quoting 2 Elliot's Debates 292–93).

■ Although *U.S. Term Limits* is not controlling authority on the constitutionality of term limits for State legislatures, it does demonstrate how term limits impede Plaintiffs' abilities to have a voice in the selection of their representatives. By limiting Plaintiffs' ability to vote for their preferred candidates, the State is encroaching upon a fundamental principle of representative democracy.[8] Proposition 140 therefore burdens Plaintiffs' right to vote for the candidates of their choice and the right of "each citizen [to] have an equally effective voice in the election of members of his state legislature." *Reynolds,* 377 U.S. at 565, 84 S.Ct. at 1383.

#### 2. Right to Vote for Particular Candidate

■ The State concedes that its term limits provisions prevent citizens from voting for particular candidates. It seeks to minimize the significance of this restriction by arguing that voters do not enjoy a fundamental right to vote for the particular candidate of their choice. This observation is correct in the sense that ballot access provisions are not automatically subject to strict scrutiny simply because they exclude candidates who do not comply with their requirements. In *Burdick,* for example, the Supreme Court upheld Hawaii's prohibition on write-in vot-

---

8. That term limits were imposed by popular initiative rather than by the legislature does not protect them from judicial review. Popular initiatives are held to the same constitutional standards as other legislation. A majority of voters may not deprive individuals of constitutional

rights, just as the legislature may not. *See U.S. Term Limits,* 514 U.S. at 809 n. 19, 115 S.Ct. at 1858 n. 19; *Lucas v. Forty–Fourth General Assembly,* 377 U.S. 713, 736, 84 S.Ct. 1459, 1473–74, 12 L.Ed.2d 632 (1964).

ing. 504 U.S. at 441, 112 S.Ct. at 2067. By denying voters the ability to cast write-in ballots, Hawaii prevented voters from voting for candidates who had not complied with Hawaii's elections procedures. The Court upheld Hawaii's ban on write-in voting because Hawaii provided aspiring candidates a variety of other means of gaining access to the ballot. *Id.* Thus, voters can be denied the opportunity to vote for a particular candidate, provided that constitutionally adequate alternative means for appearing on the ballot were available to that candidate.

California's version of term limits, however, does not simply create a procedural hurdle or impose a temporary restriction. It permanently denies voters the opportunity to vote for particular candidates as well as for any candidates with extensive experience as a State legislator. The State's argument that the voter Plaintiffs do not have a fundamental right to vote for a particular candidate at a particular election is therefore not dispositive of Plaintiffs' challenge to the constitutionality of lifetime legislative term limits.

### 3. Freedom of Association

■ The right of voters "to cast their votes effectively" overlaps with "the right of individuals to associate for the advancement of political beliefs." *Williams,* 393 U.S. at 30, 89 S.Ct. at 10. Although term limits do not directly prohibit individuals from associating for the advancement of common beliefs, they do limit the ability of individuals to take advantage of the galvanizing effects of elections on political organization. The exclusion of candidates from the ballot "burdens voters' freedom of association ... because an election campaign is an effective platform for the expression of views on the issues of the day, and a candidate serves as a rallying point for like-minded citizens." *Anderson,* 460 U.S. at 787–88, 103 S.Ct. at 1569. *See also Eu v. San Francisco County Democratic Cent. Comm.,* 489 U.S. 214, 222–25, 109 S.Ct. 1013, 1019–21, 103 L.Ed.2d 271 (1989).

Term limits restrict Plaintiffs' freedom to associate because candidates who have been effective rallying points for political activity in the past are excluded from running for re-election. The voter Plaintiffs are thus denied the opportunity to rally political support behind their favored candidate for a particular office precisely because their favored candidate has been repeatedly successful in the past. Term limits therefore burden Plaintiffs' freedom of association by denying them the opportunity to use the device of a political campaign on behalf of their favored candidate to promote their political goals.

### 4. The Right to Run for a Particular Office

■ The State also contends that individuals do not have a fundamental right to run as candidates for particular offices. *See Clements v. Fashing,* 457 U.S. 957, 963, 102 S.Ct. 2836, 2843–44, 73 L.Ed.2d 508 (1982) (plurality opinion); *Stiles v. Blunt,* 912 F.2d 260, 265 (8th Cir.1990), *cert. denied,* 499 U.S. 919, 111 S.Ct. 1307, 113 L.Ed.2d 241 (1991); *Plante v. Gonzalez,* 575 F.2d 1119, 1126 (5th Cir.1978), *cert. denied,* 439 U.S. 1129, 99 S.Ct. 1047, 59 L.Ed.2d 90 (1979). As explained above, however, the right of a candidate to run for office is intertwined with the voting and associational rights of the electorate. The availability of political opportunity to particular candidates affects a broader range of interests than potential candidates' interests in seeking office. "[V]oters can assert their political preferences only through candidates or political parties.... The right of a party or an individual to a place on the ballot is entitled to protection and is intertwined with the rights of voters". *Lubin,* 415 U.S. at 716, 94 S.Ct. at 1320. *See also Burdick,* 504 U.S. at 438, 112 S.Ct. at 2065–66.

■ The interest of Plaintiffs Bates, Escutia, and Friedman in running for the Assembly therefore merits protection because their interest in running for office necessarily implicates the voter Plaintiffs' voting and associational rights.

### B. Severity of the Burden Imposed by Term Limits

Proposition 140 thus burdens Plaintiffs' fundamental rights to vote on an equal basis with others and to associate for the advance-

ment of their political views. That term limits burden fundamental rights, however, does not end the Court's inquiry. The Court must also determine the severity of the burden that term limits impose on these rights.

The Supreme Court has not articulated a test for determining when a burden is severe. By referring to "reasonable, nondiscriminatory restrictions," *Anderson* and *Burdick* hinted at some possible criteria for determining the severity of the burden, but the terms "reasonable" and "nondiscriminatory" are not self-defining.

One year before *Anderson*, the Supreme Court upheld a Texas provision which prohibited justices of the peace from running for the legislature if they would have to cut short their service as justices of the peace in order to serve in the legislature. *Clements v. Fashing*, 457 U.S. 957, 968, 102 S.Ct. 2836, 2846, 73 L.Ed.2d 508 (1982). The Court determined that this limitation did not significantly limit ballot access because it imposed, at most, a two-year waiting period on justices of the peace who desired to run for the legislature. *Id.* at 967–68, 102 S.Ct. at 2845–46.

■■■ Unlike the restriction at issue in *Clements*, Proposition 140 imposes a lifetime ban on term-limited legislators from being elected to the legislature. The holding of the Supreme Court in *Clements*, which found that a brief waiting period does not constitute a significant barrier to candidacy, is not inconsistent with a finding that lifetime term limits impose a serious burden on Plaintiffs' constitutional rights. Indeed, *Clements*, by emphasizing the short-term nature of the restriction imposed on Texas justices of the

peace, lends support to a finding that permanently excluding a class of candidates from the ballot imposes a serious burden on candidates' and voters' rights.[9]

The district court evaluating the constitutionality of Maine's limit on consecutive terms of legislative service offered a related approach for evaluating the severity of the burden imposed by term limits. It observed that there are "two key indicators of when a restriction moves from legitimate to severe: whether the restriction is content based or content neutral, and the extent to which the alternative routes to ballot access minimize the restriction on the plaintiff's rights." *League of Women Voters v. Diamond*, 923 F.Supp. 266, 269 (D.Me.1996) (denying preliminary injunction), *aff'd*, 82 F.3d 546 (1st Cir.1996). The court concluded that consecutive term limits impose a burden that is "clearly not *de minimis*" but that is also not sufficient to require strict scrutiny. *Id.* at 270.

The court justified its conclusion on two grounds. First, it argued that term limits "cannot fairly be characterized as content based" because such provisions do not "distinguish between or select among the range of ideas and political discourse from which voters can choose." *Id.*

A number of other courts have also emphasized the content neutrality of term limits when finding that they do not impose a severe burden on voters' rights. *Eu*, 54 Cal.3d at 519, 286 Cal.Rptr. 283, 816 P.2d 1309; *Roth*, 603 N.Y.S.2d at 971.

Term limits are content neutral in the sense that they do not target candidates on the basis of the views they espouse.[10] They

---

**9.** A plurality of the Court in *Clements* argued that the Court should focus on whether ballot access provisions exclude "certain classes of candidates from the electoral process." *Id.* at 964, 102 S.Ct. at 2844. The plurality would apply heightened scrutiny when a ballot access provision was based on wealth or imposed burdens on small political parties or independent candidates. Otherwise, the plurality urged the Court to apply heightened scrutiny only after examining the extent of the burden imposed by the restriction on candidacy. *Id.* at 966, 102 S.Ct. at 2845. The test articulated more recently by a majority of the Court is less concerned with the particular classification used than with the "extent and nature"

of the impact of ballot access provisions on voters. *Anderson*, 460 U.S. at 786, 103 S.Ct. at 1568–69.

**10.** However, some of the ballot access provisions that the Supreme Court has struck down were content neutral in this sense, too. Early filing deadlines or high filing fees do not *explicitly* target candidates on the basis of the message they espouse. The Supreme Court has found, however, that they are likely to impose burdens on the ability of some voters to express their preferences in the electoral process. *See Anderson*, 460 U.S. at 780, 103 S.Ct. at 1565 (striking down early filing deadline); *Bullock v.*

are not content neutral in another, important sense. Proposition 140 targets legislators with legislative experience. In 1990, approximately 47.83% of the California electorate, and a majority of voters in thirty of California's eighty assembly districts, voted against the strict version of term limits imposed by Proposition 140. A portion of the vote against Proposition 140 was cast by voters who desired to retain the ability to vote for experienced candidates.[11] Proposition 140 prevents this minority from voting for candidates possessing a desired characteristic simply because those candidates possess that characteristic. That characteristic, legislative experience, distinguishes conflicting political views about the best forms of political representation. Term limits skew the electoral process by preventing a significant minority from at least voting for, if not electing, candidates who embody a particular view of political representation that is opposed by the majority. Term limits thus impose a content-based restriction on the ability of voters to vote for the candidates of their choice. *See Thorsted v. Gregoire,* 841 F.Supp. 1068, 1082 (W.D.Wash.1994), *aff'd on other grounds,* 75 F.3d 454 (9th Cir.1996).

*League of Women Voters* also stressed that Maine's limit on consecutive terms does not completely foreclose ballot access to incumbents. 923 F.Supp. at 270.[12] Term-limited legislators could sit out one or more terms and then run again, or they could run for a different office. *Id.* Proposition 140, in contrast, imposes a lifetime limit of three terms in the Assembly and two terms in the Senate. *Eu,* 54 Cal.3d at 506, 286 Cal.Rptr. 283, 816 P.2d 1309. Although term-limited Assembly members may run for other offices, they are absolutely precluded from running for the Assembly. Proposition 140 thus imposes a significantly greater burden on voters' and candidates' rights than the burden imposed by Maine's limit on consecutive terms, which itself was "clearly not *de minimis.*"

Proposition 140 prevents Plaintiffs from expressing their political preference for candidates with legislative experience. Term limits therefore restrict the ability of certain voters to participate in the electoral process on an equal basis with other voters because of their political preferences for a particular category of candidates or for an individual candidate. In addition, unlike the majority of States that have imposed term limits on State legislators, California's version of term limits imposes a lifetime limit on legislative service. California voters who value legislative experience or a particular candidate are not simply required to defer expressing their preference, they are forever prevented from expressing their preference at the ballot box. *See also U.S. Term Limits,* 514 U.S. at 834–35, 115 S.Ct. at 1870 (congressional term limits disadvantage particular class of candidates); *Thorsted,* 841 F.Supp. at 1082 (congressional term limits not neutral or nondiscriminatory because they determine outcome, not procedures, of election).

Because lifetime legislative term limits impose a content-based restriction on the eligibility of candidates for legislative office and because they permanently restrict Plaintiffs' ability to vote for their preferred candidates, the Court finds that the legislative term limits provisions of the California Constitution impose a severe burden on Plaintiffs' First

*Carter,* 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972) *(striking down high filing fees).*

**11.** It is difficult and unnecessary to determine precisely what portion of the electorate opposed term limits entirely. Another initiative on the November, 1990, ballot was Proposition 131, which would have instituted public campaign financing and limited Senators to three consecutive terms and Assembly members to six consecutive terms. Proposition 131 received only 37.75% of the vote. Tr.Ex. 50. No evidence was submitted to indicate how many voters supported the version of term limits in Proposition 131 but not the more extreme version in Proposition 140. Because Proposition 131 would not have imposed a lifetime limit on legislative service and provided for longer periods of uninterrupted service than Proposition 140, it would not have imposed the same kind of restriction on the ability of voters to vote for experienced candidates.

**12.** At least two other cases in which term limits were upheld also involved limits on consecutive service. *Miyazawa v. City of Cincinnati,* 825 F.Supp. 816, 817 (S.D.Ohio 1993), *aff'd on other grounds,* 45 F.3d 126 (6th Cir.1995); *Roth v. Cuevas,* 158 Misc.2d 238, 603 N.Y.S.2d 962 (Sup. Ct.), *aff'd,* 197 A.D.2d 369, 603 N.Y.S.2d 736

and Fourteenth Amendment rights of voting, expression, and association.

## C. Importance of the State's Interests in Term Limits

After considering "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate," the Court must "identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by the rule." *Anderson*, 460 U.S. at 789, 103 S.Ct. at 1570. The Court must also "consider the extent to which those interests make it necessary to burden [Plaintiffs'] rights." *Id.* The State has identified two general categories of interests that are served by term limits. First, it argues that States have a sovereign right to restructure their political processes and to define the qualifications for important State offices. Second, it contends that term limits advance a variety of interests related to enhancing political accountability and representation.

### 1. State Sovereignty

#### a. *Gregory v. Ashcroft* and the Political Function Cases

The State argues that the Tenth Amendment and principles of federalism protect its prerogative to determine the structure of government and the qualifications of its officers. The principal case on which the State relies is *Gregory v. Ashcroft*, 501 U.S. 452, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991). In *Gregory*, the petitioners challenged the legality of a provision of the Missouri Constitution requiring State judges to retire upon reaching the age of seventy. They argued that the mandatory retirement provision violated the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621–634, and the Equal Protection Clause. The Supreme Court, noting the importance of a State's ability to prescribe the qualifications for holding State offices, crafted a "plain statement" rule. Under this rule, the Court would not construe federal employment laws

to apply to important State offices absent an unambiguous statement of statutory intent. *Gregory*, 501 U.S. at 468–70, 111 S.Ct. at 2404–06. The Court held that the ADEA does not unambiguously apply to State judges; therefore, mandatory retirement provisions for State judges do not violate the ADEA. *Id.* at 470, 111 S.Ct. at 2406. Significantly, the Court did not hold that Congress could not pass legislation governing qualifications for holding important State offices. It simply held that, in the case of the ADEA, Congress had not legislated the retirement age of State judges.[13]

While discussing the significance of a State's ability to define the qualifications for holding important State offices, the Supreme Court observed that,

> Through the structure of its government, and the character of those who exercise government authority, a State defines itself as a sovereign. 'It is obviously essential to the independence of the States, and to their peace and tranquility, that their power to prescribe the qualifications of their own officers ... should be exclusive, and free from external interference, except so far as plainly provided by the Constitution of the United States.'

*Id.* at 460, 111 S.Ct. at 2400 (quoting *Taylor v. Beckham*, 178 U.S. 548, 570–71, 20 S.Ct. 890, 898, 44 L.Ed. 1187 (1900)). *See also Rodriguez v. Popular Democratic Party*, 457 U.S. 1, 8, 102 S.Ct. 2194, 2199, 72 L.Ed.2d 628 (1982) ("The methods by which the people of Puerto Rico and their representatives have chosen to structure the Commonwealth's electoral system are entitled to substantial deference."). Although *Gregory* noted that the federal Constitution does place some limits on the power of State governments to define the qualifications for State office, it also pointed out that the "Court has never held that the [Fourteenth] Amendment may be applied in complete disregard for a State's constitutional powers. Rather, the Court has recognized that the States' power to define the qualifications of their officehold-

---

(App.Div.), *aff'd*, 82 N.Y.2d 791, 604 N.Y.S.2d 551, 624 N.E.2d 689 (1993).

**13.** The Court also reiterated that age is not a suspect classification. Applying rational basis

review, it held that the mandatory retirement provision did not violate the Equal Protection Clause. *Id.* at 473, 111 S.Ct. at 2407–08.

ers has force even as against the proscriptions of the Fourteenth Amendment." *Id.* at 469, 111 S.Ct. at 2405.

*Gregory* identified the "political function" cases as examples of Fourteenth Amendment cases in which the Supreme Court deferentially reviewed States' power to define the qualifications for holding State office. These cases provide that laws excluding non-citizens from important governmental positions are subject to less rigorous scrutiny than laws that make classifications on the basis of alienage usually receive. *Id.* at 463, 111 S.Ct. at 2402 (citing *Bernal v. Fainter,* 467 U.S. 216, 220, 104 S.Ct. 2312, 2316, 81 L.Ed.2d 175 (1984)). In *Sugarman v. Dougall,* the Court declined to apply strict scrutiny to laws prohibiting non-citizens from holding offices that serve a political function because of the States' interest in preserving " 'the basic conception of a political community.' " 413 U.S. 634, 647, 93 S.Ct. 2842, 2850, 37 L.Ed.2d 853 (1973) (quoting *Dunn v. Blumstein,* 405 U.S. 330, 344, 92 S.Ct. 995, 1004, 31 L.Ed.2d 274 (1972)). Because the Court viewed non-citizens as falling outside the political community, States were justified in excluding non-citizens from positions intimately related to the life of the political community.

The political function cases upon which the *Gregory* Court relied for its observation are of little relevance to term limits. The Supreme Court's analysis in the political function cases turned on the ability of communities to restrict certain politically sensitive jobs to members of the political community. Term limits, in contrast, burden the ability of voters and candidates, the defining elements of the political community, to participate on an equal basis in the electoral process.

*Gregory* does establish that States have a substantial interest in defining the qualifications for important State offices, but it is not dispositive in the context of term limits. *Gregory* observed that federalism sometimes limits the force of the Fourteenth Amendment, but, with the exception of the political function cases, it did not specify when federalism concerns override normal Fourteenth Amendment standards. Indeed, the Supreme Court has recently clarified that *Greg-*

*ory* does not stand for the proposition that States may disregard basic constitutional protections when establishing the conditions of candidacy for State office. *Chandler v. Miller,* —— U.S. ——, ——, 117 S.Ct. 1295, 1302–03, 137 L.Ed.2d 513 (1997). Term limits implicate not only the Fourteenth Amendment, but also the First Amendment. *Gregory,* however, did not suggest that federalism concerns can override the strictures of the First Amendment. *See Chandler,* —— U.S. at ——, 117 S.Ct. at 1302–03 (State's power to establish qualifications for State offices does not diminish the constraints on State action imposed by the Fourth Amendment). Finally, as explained below, the Supreme Court has been especially rigorous in its application of the Fourteenth Amendment when the right to vote is at stake. *Gregory* did not involve voting rights.

b. Voting Rights Cases

The voting rights cases establish that the Fourteenth Amendment limits States' leeway in determining the basis for political representation. In *Baker v. Carr,* the Supreme Court held that the manner in which a State apportions legislative representation presents a justiciable controversy. 369 U.S. 186, 232, 82 S.Ct. 691, 718, 7 L.Ed.2d 663 (1962). The Court observed that "the presence of a matter affecting State government does not render the case nonjusticiable." *Id.* In subsequent decisions, the Court held that State legislatures must be elected according to the principle of one person, one vote. *See, e.g., Reynolds,* 377 U.S. at 568, 84 S.Ct. at 1384–85; *Lucas v. Forty–Fourth General Assembly,* 377 U.S. 713, 736, 84 S.Ct. 1459, 1473–74, 12 L.Ed.2d 632 (1964).

These decisions struck at the heart of States' ability to decide how to structure their electoral systems. *See Baker,* 369 U.S. at 334, 82 S.Ct. at 772–73 (Harlan, J., dissenting). Moreover, the decisions held State governments to a different standard than the federal government. State senate districts, for example, were required to be determined on the basis of population, not political subdivision. *Reynolds,* 377 U.S. at 568, 84 S.Ct. at 1384–85. The Court explicitly rejected the argument that counties could serve as the

basis for representation in State senates just as States are the basis for representation in the United States Senate. *Id.* at 573–75, 84 S.Ct. at 1387–89. The Court also rejected systems for the election of Statewide officers that were explicitly patterned after the Electoral College. *Gray v. Sanders,* 372 U.S. 368, 377–80, 83 S.Ct. 801, 806–09, 9 L.Ed.2d 821 (1963).

The Fourteenth Amendment, then, was applied to overturn basic structures integral to State government, structures that had been in place for decades and that had direct federal analogies. The Supreme Court justified its far-reaching actions by pointing to the importance of providing all voters an equal basis for participating in the electoral process. That term limits reflect a basic decision by the State about what the character of the State legislature should be, therefore, does not establish that those decisions must necessarily survive constitutional review or that they should be subject to a more deferential standard of review. This is especially true given the manner in which term limits restrict Plaintiffs' voting rights.

c. State Sovereignty and Narrow Tailoring

■ *Anderson* and *Burdick* instruct courts to consider whether the means chosen by the State is narrowly tailored to accomplish the State's asserted interest. Insofar as sovereignty consists of the exercise of discretion, it is anomalous to ask whether a particular means chosen by the State is narrowly tailored to serve the State's interest in exercising its sovereignty. The State's sovereign interest, however, cannot be sufficient by itself to establish the constitutionality of political reforms. Otherwise, any political decision by the State could escape constitutional scrutiny. Because of the severity of the burden lifetime legislative term limits impose on voters' First and Fourteenth Amendment rights, the State must identify other interests that are advanced by term limits. The State's sovereign interest in shaping its own political institutions and defining the qualifications for holding high political office, however, lends significance to the State's other interests.

2. Political Accountability and Representation

The State asserts six interests related to enhancing political accountability and representation: ending political careerism, overcoming incumbent advantages, increasing electoral competition, encouraging qualified candidates to run for office, and reinstating rotation, a "central tenet of republican government." Many of these interests, however, rest on the State's assumption that legislators had become invulnerable to the normal means of insuring political accountability during the 1980s.

a. Legislative Turnover

■ The State has not proven its factual assertions that legislators attained unprecedented job security during the 1980s and had become invulnerable and insensitive to less drastic measures designed to insure political accountability. The State's expert testified that the rate of turnover in the legislature declined noticeably between the 1970s and 1980s. Tr. 553 (Petracca), Tr.Ex. 69. He attributed increased turnover during the early 1990s to anticipation of the implementation of term limits in 1996. Tr. 569. Plaintiffs' expert, however, demonstrated that the relatively high turnover rates during the 1970s and the relatively low turnover rates during the 1980s were part of a cyclical pattern in legislative turnover that has prevailed since the end of the Second World War. Tr. 345–50 (Jacobson), Tr.Exs. 32–38. It is thus inaccurate to describe the 1980s as a decade of unprecedented low rates of turnover.

The State also failed to establish that term limits were necessary to break the pattern of low legislative turnover that some perceived as emerging during the 1980s. Although legislative turnover in California increased following the approval of Proposition 140, turnover also increased in the United States House of Representatives, which was not affected by term limits. Tr. 358–62 (Jacobson), Tr.Ex. 38. Plaintiffs attribute increased turnover during the early 1990s in both the California legislature and the House of Representatives to a variety of factors: legislative reapportionment, a spate of scandals,

and national political trends. Tr. 359. A similar combination of influences was also responsible for relatively high rates of turnover during the 1970s. Tr. 352. Even assuming that low rates of legislative turnover are undesirable and that turnover declined to an unprecedented low during the 1980s, then, the State has failed to establish that term limits were necessary to rectify the low turnover rates of the 1980s.

### b. The State's Interests

### i. Political Careerism

The preamble to Proposition 140 declared political careerism to be one of the problems afflicting California politics. Cal. Const. art. IV, § 1.5. Legislative term limits do not prevent people from making careers as politicians. They limit the amount of time that individuals may serve in the legislature, but they do not prevent legislators from running for other political offices, nor do they prevent individuals who have spent a lifetime in other political offices from running for the legislature.

■■■ Term limits do prevent individuals from pursuing careers as State legislators, but the State has not established that its interest in preventing people from pursuing careers in the legislature is important enough to justify the burden that term limits impose on voting rights. The State contends that professional politicians become socialized in a culture of government and therefore become distant from and unresponsive to their constituents. Tr. 536 (Petracca). Nonprofessional legislators, the State maintains, will introduce fresh ideas into the legislative process, be less motivated by concerns for their careers, and more responsive to constituents' concerns. Tr. 537.

Concern for their own careers, however, motivates those who hope to pursue a legislative career to be responsive to constituents. Re-election is a powerful incentive for legislators to be attentive to constituents' needs and priorities. Tr. 82–83 (Fiorina); 342–44 (Jacobson). Voters have the ability to elect someone else if their legislator ceases to represent their interests or their views.

Term limits reflect an ideological preference for "citizen" or amateur legislators. The State has a legitimate interest in allowing voters to express their preference for amateur legislators, but it does not have a legitimate interest in preventing other voters from expressing their ideological preference for career or professional legislators. *See Buckley v. Valeo*, 424 U.S. 1, 48–49, 96 S.Ct. 612, 649, 46 L.Ed.2d 659 (1976) ("the concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment").

The State has therefore failed to establish that the pursuit of legislative careers, by itself, impedes effective representation or electoral competition. Ending legislative careerism, therefore, is not a substantial or compelling State interest.

### ii. Advantages of Incumbency

The strongest interest articulated by the State is the State's interest in reducing the advantages that incumbents enjoy over rival candidates simply because they are incumbents. Incumbency confers a variety of advantages on legislators. Some of these advantages are inherent in the position; others generally accompany incumbency but can be restricted or eliminated. Some advantages are the fair rewards of desirable behavior; others may be unfair and undeserved.

■■■ Inherent advantages of incumbency include visibility, public recognition, and gratitude for services rendered. Visibility and recognition facilitate communications between legislators and their constituents and permit the public to monitor their political representatives. Tr. 71 (Fiorina). The gratitude that legislators earn by representing the political interests of their constituents is itself an important incentive for legislators to remain attentive to voters. To the extent that term limits diminish the value of visibility and gratitude, they may make legislators less sensitive to the priorities of their constituents. Tr. 84. The State has therefore failed to establish that it has a significant interest in eliminating these inherent advantages of incumbency.

Other advantages of incumbency, however, are less desirable in the legislative process. Among the most significant of these advantages are fundraising ability, the perquisites of office, and control over legislative redistricting. Tr. 73–75. The State does have a compelling interest in limiting these advantages because they hinder political accountability and discourage political opposition.

Although term limits are one way to eliminate these advantages, the State did not establish that other, less constitutionally intrusive reforms, would be less effective than term limits. Perquisites of office can be, and to an extent already have been, restricted by initiative or by normal legislation. Control over legislative redistricting can be assigned to a nonpartisan body, as occurred following the 1990 census. Public financing of legislative campaigns could reduce the significance of political fundraising.[14]

Even if the State had established that nothing short of a ban on incumbents from seeking re-election could overcome the unfair advantages of incumbency, it has not established that this ban must be permanent. Some advantages of incumbency, such as the perquisites of office, vanish as soon as an incumbent leaves office. Others, such as recognition and gratitude, fade over time. Professor Jacobson studied the success of former members of Congress who ran for re-election after being out of office. Most of these former congress members ran for re-election within four years of leaving office. He found that former congress members are no more likely to be elected than other candidates who have prior political experience. Tr. 379.

Although the State does have a compelling interest in limiting the undesirable advantages of incumbency, other reforms that do not raise significant constitutional problems would also advance the State's interest. Lifetime term limits, therefore, are not narrowly tailored to accomplish the State's interest in diminishing the undesirable advantages of incumbency.

### iii. Electoral Competition

The State argues that term limits advance its interest in promoting electoral competition. Incumbents generally do not face serious challenges in primary elections and often escape serious challenges in general elections as well. *See* Tr.Ex. 69. In addition, larger numbers of candidates run for open seats than for seats held by incumbents seeking re-election, and the margin of victory in contests for open seats tends to be closer. Tr. 560–67 (Petracca). Because term limits will periodically create open seats, the State contends, more electoral competition will result.

As used by the State, the term electoral competition refers to increasing the number of candidates running for office and decreasing the margins by which candidates win elections. Neither of these interests, by themselves, are compelling interests because it is not self-evident that they have a desirable effect on government. The State's argument is tantamount to saying that electoral competition will be improved by eliminating the strongest competitors from the field. The State argues, however, that intensifying electoral competition is a compelling State interest because it will have the effect of increasing the opportunity for the electorate to make judgments about party platforms and promoting clearly defined debate about public policy choices. Tr. 571–77.

By periodically preventing incumbents from running for re-election, term limits may help focus debate on the political stances of the candidates and their parties rather than on how well the incumbent has represented the district. Although the State has a legitimate interest in encouraging debate about public policy, for the State to promote a favored form of political discourse by pre-

---

14. The State argues that public financing of campaigns is not a realistic alternative to term limits and therefore does not establish that term limits are an overbroad solution to incumbent advantages. The California electorate's past refusal to adopt reforms that are narrowly tailored to redress incumbent advantages in fundraising, however, cannot shield term limits from constitutional scrutiny. The State's argument is tantamount to saying that popular but unconstitutional solutions to serious problems should survive judicial scrutiny if narrowly tailored, constitutional solutions to those problems are unpopular.

venting voters from voting for a disfavored category of candidates raises serious First Amendment and voting rights concerns. *See Buckley,* 424 U.S. at 48–49, 96 S.Ct. at 648–49. The State, therefore, cannot justify term limits on the grounds that they encourage certain forms of political debate.

The State's argument overlooks one of the main purposes of electoral competition: promoting electoral accountability. The threat of electoral competition encourages incumbents to be attentive to their constituents' needs and to represent their interests vigorously. Tr. 82 (Fiorina). That incumbents often face weak challengers in elections does not necessarily indicate that they are unaccountable to their constituents. It may indicate that they are forestalling serious opposition by representing their districts in a manner their constituents support.

Indeed, term limits may undermine electoral accountability by reducing incentives for legislators to represent their districts. Tr. 84 (Fiorina); 384 (Jacobson). It takes a major investment of time and effort to become familiar with a legislative district. The possibility of re-election is a strong incentive for legislators to make this investment. Term limits diminish the incentive for undertaking this work because legislators can no longer look forward to the possibility that their hard work will yield political dividends in subsequent elections. Tr. 391–92 (Jacobson).

■■■ Even if the State had established that increasing the number of candidates running for office and decreasing the margin by which candidates win elections were compelling interests, it has not established that lifetime term limits are narrowly tailored to accomplishing these interests. Limiting the number of consecutive terms that legislators may serve would also periodically create open-seat elections.

The State, therefore, has failed to establish either that increasing the number of candidates running for office and decreasing the margin by which candidates win elections are compelling interests or that lifetime term limits are narrowly tailored to accomplishing these goals.

### iv. Encouraging Qualified Candidates

The State also argues that term limits will encourage more and better qualified candidates to run for legislative office. Because term limits will create more open seats than otherwise would have occurred, it is probably true that term limits will encourage more people to run for the legislature. There is no evidence that those candidates will be more qualified. It is incongruous to argue that term limits will encourage better candidates to run for office while at the same time preventing popular candidates from running for re-election.

■■■ Although it is legitimate for the State to create conditions that will encourage more individuals to run for legislative office, for the State to encourage some candidates by forbidding others from running raises serious First Amendment concerns. *See Buckley,* 424 U.S. at 48–49, 96 S.Ct. at 648–49.

The encouragement that term limits provide to qualified candidates who would not otherwise run for the legislature, therefore, does not constitute a compelling State interest. Neither is the lifetime ban narrowly tailored to achieve this result.

### v. Representativeness of Legislature

The State also contends that term limits will make the legislature more representative. The State's expert, Professor Petracca, argued that term limits make the legislature more demographically and ideologically representative. Tr. 586.

■■■ The evidence is mixed concerning the effects of term limits on demographic representation within the legislature. Term limits probably will increase the number of women in the legislature in the short term. In elections for open seats to the legislature, male and female candidates fare equally well. Incumbents, however, enjoy an advantage over challengers. Because incumbents have been disproportionately male, it is logical to conclude that term limits will accelerate the rate at which women become legislators. Tr. 589 (Petracca); Tr. 395 (Jacobson). This will be a short-term phenomenon, however.

It is not clear that term limits will make the legislature more representative of other demographic groups. Legislative reapportionment has been the predominant factor behind the increasing representation of ethnic minorities. Tr. 394 (Jacobson). It is doubtful that term limits alone will produce more candidates from less affluent sectors of society. Tr. 393. Term limits may encourage more candidates with background in business, although this is disputed. Tr. 593 (Petracca); Tr.Ex. 69, table 14.

The effects of term limits on the demographic composition of the legislature, thus, are speculative. Speculation about the possible effects of term limits cannot justify the severe burdens imposed on the ability of voters to vote for candidates of their choice. Even if the State's argument that term limits will make the legislature more demographically representative were not speculative, the State has not established that lifetime term limits will be more effective at achieving this goal than limits on consecutive terms.

■ The State also argued that term limits will make the legislature more ideologically representative. Term limits will accomplish this, according to the State, because political debate will focus less on the incumbent's ability to provide constituent services than on candidates' political stances. Tr. 595–96 (Petracca). The First Amendment, however, prohibits the State from restricting expressive activity in order to promote favored forms of political discourse. Therefore, the State cannot justify term limits on the ground that preventing voters from voting for certain candidates will result in a more elevated form of political debate.

vi. Rotation

The State also maintains that "term limits reinstate rotation, a central tenet of republican government." By equating term limits with the eighteenth- and nineteenth-century practice of rotation of office, the State seeks to establish that term limits are a legitimate innovation with deep roots in American history. The State also attempts to establish that term limits are entirely consistent with principles of republican self-government.

■ Term limits resemble the historical practice of rotation to the extent that both prevent prolonged, uninterrupted legislative service. As explained above, however, California's extreme version of term limits is quite different from rotation in that it imposes a lifetime cap on legislative service. The State also exaggerates the centrality of rotation to early American political philosophy. It was a widespread practice, but few States imposed rotation as a formal requirement. The Constitutional Convention considered and rejected proposals to require rotation. *See U.S. Term Limits,* 514 U.S. at 811–13, 115 S.Ct. at 1859–60.

That rotation was a widespread practice in the eighteenth and nineteenth centuries, however, does not establish that California has a compelling or important interest in reinstating rotation and converting it into a lifetime ban. In addition, most of the evidence the State presented concerning rotation antedates the ratification of the Fourteenth Amendment. All of it precedes important Supreme Court decisions concerning voting rights and ballot access. Instituting a form of rotation, therefore, does not constitute a significant State interest.

D. Lifetime Term Limits and Narrow Tailoring

As explained above, lifetime term limits are not narrowly tailored to achieve the goals articulated by the State. Indeed, the State's own expert testified that he prefers a limit on the number of consecutive terms that legislators may serve to lifetime term limits. He believes that lifetime term limits squander valuable legislative experience. Tr. 687. The most obvious method of making California's version of term limits more narrowly tailored would be to convert it into a limit on the number of consecutive terms that legislators may serve.[15]

---

**15.** The Court expresses no opinion on the constitutionality of any form of term limits other than the lifetime legislative term limits imposed by Proposition 140.

The State contends, however, that consecutive term limits would not achieve its goals for several reasons. The most significant of these reasons are placeholding legislators and the creation of a revolving door between the legislature and lobbying firms. Tr. 619; *see also Eu,* 54 Cal.3d at 523, 286 Cal.Rptr. 283, 816 P.2d 1309. The State fears that term-limited legislators will make deals with their successors whereby their successors would agree to step aside once their predecessors become eligible for office again. Although it is conceivable that such deals might occasionally be made, such speculation is insufficient to justify permanently restricting voters' choice of candidates. The danger that legislators will leave office to work in lobbying firms only to return to the legislature a few years later can be limited by legislation.

The Court therefore rejects the State's contention that consecutive term limits would create problems which are serious enough to justify the imposition of lifetime term limits.

### E. Summary

Two of the interests asserted by the State are compelling: its sovereignty interest in defining its own political institutions and its interest in reducing the unfair electoral advantages incumbents enjoy. The State's other interests do not stand up to close examination.

The lifetime legislative term limits provisions of the California Constitution are not narrowly tailored to serve the State's compelling interests. The State's sovereign interest in reforming its political institutions is not sufficient, by itself, to justify measures which burden rights protected by the First and Fourteenth Amendments. California's version of lifetime term limits is not narrowly tailored to reduce the electoral advantages of incumbency. A variety of targeted reforms could redress the most troublesome advantages of incumbency. Less drastic versions of term limits would also be effective at significantly reducing the undesirable advantages of incumbency.

### CONCLUSION

The lifetime term limits on State legislative offices enacted by Proposition 140 impose a severe burden on Plaintiffs' First and Fourteenth Amendment rights of voting and association. The State has not established that lifetime term limits are narrowly tailored to serve a compelling State interest.

The Court therefore

1. DECLARES that the lifetime term limits provisions contained in section 2(a) of article IV of the California Constitution violate the United States Constitution;

2. ENJOINS Defendants Clark and McCormack from enforcing the lifetime term limits provisions contained in section 2(a) of article IV of the California Constitution against Plaintiffs and to accept the declarations of intention to be a candidate and the nomination papers when tendered by Plaintiffs Bates, Friedman, or Escutia; and

3. ENJOINS Defendant Jones from enforcing the lifetime term limits provisions contained in section 2(a) of article IV of the California Constitution against Plaintiffs, to accept and process the declarations of intention to be a candidate and the nomination documents of Plaintiffs Bates, Friedman, or Escutia, to certify Plaintiff legislators' eligibility to be candidates (if all other requirements are met), and to certify the elections results if Plaintiff legislators win the election.

### STAY PENDING APPEAL

Under Federal Rule of Civil Procedure 62(c), the Court has discretion to stay an injunction during the pendency of an appeal. The standard for granting a stay is the same as the standard for granting a preliminary injunction: a showing of " 'either (1) a combination of probable success on the merits and the possibility of irreparable injury or (2) that serious questions are raised and the balance of hardships tips sharply' " in favor of the party subject to the injunction. *Tribal Village of Akutan v. Hodel,* 859 F.2d 662, 663 (9th Cir.1988) (quoting *Los Angeles Memorial Coliseum Comm'n v. National Football League,* 634 F.2d 1197, 1201 (9th Cir.1980)). The constitutionality of legislative term limits is an issue of first impression in the Ninth

Circuit. The State has raised serious questions concerning the constitutionality of term limits. The balance of hardships involved in enforcing the injunction before these questions are finally decided tips sharply in the State's favor. Enjoining enforcement of term limits prior to appellate review may throw the State's electoral process into confusion. Staying the injunction may effectively deny Plaintiffs the opportunity to seek re-election to the Assembly in 1998, but, should the judgment of the Court be affirmed on appeal, it will not permanently deny Plaintiffs the opportunity to seek election to the Assembly. The Court therefore STAYS the injunction granted in this order for thirty days and, if the State files an appeal, during the pendency of the appeal to the Ninth Circuit Court of Appeals.

IT IS SO ORDERED.